# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | |
|---|---|
| GEORGE ASSAD, derivatively on behalf of Nominal Defendant BERRY CORP., ) )<br><br>Plaintiff, )<br><br>vs. )<br><br>ARTHUR T. SMITH, CARY BAETZ, GARY A. GROVE, BRENT S. BUCKLEY, KAJ VAZALES, EUGENE J. VOILAND, ANNE MARIUCCI, and DONALD PAUL, )<br><br>Defendants, )<br><br>and )<br><br>BERRY CORP., )<br><br>Nominal Defendant. ) | Civil Action No.<br><br>**VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT**<br><br><br>DEMAND FOR JURY TRIAL |

Plaintiff George Assad ("Plaintiff"), by and through his undersigned attorneys, brings this stockholder derivative complaint for the benefit of nominal defendant, Berry Corp. ("Berry" or the "Company"), against current and/or former members of its Board of Directors (the "Board") and certain of its current and/or former executive officers (the "Individual Defendants", defined herein), seeking to remedy the Individual Defendants' breaches of fiduciary duties. Plaintiff's allegations are based upon his personal knowledge as to himself and his own acts, and upon information and belief, developed from the investigation and analysis by Plaintiff's counsel, including a review of publicly available information, such as filings by Berry with the U.S. Securities and Exchange Commission ("SEC"), press releases, news reports, analyst reports, investor conference transcripts, publicly available filings in lawsuits, and other matters of public record.

## I.    INTRODUCTION

1.    This is a stockholder derivative action brought for the benefit of nominal defendant Berry against the Individual Defendants, all of whom are current and/or former officers and directors of Berry, based on their non-exculpable breaches of fiduciary duty and other serious misconduct from July 26, 2018 to the present (the "Relevant Period"), as alleged in detail herein.

2.    Nominal defendant Berry, a Delaware corporation headquartered in Dallas, Texas, is a publicly-traded energy company which focuses on the development and production of conventional oil reserves, principally in California with over 90% of its total proved reserves located in the San Joaquin Basin.

3.    The oil and gas industry in California is heavily regulated, and oil producers are required to obtain a variety of permits from regulators to drill and efficiently produce oil. The Individual Defendants, in fact, recognized that the recovery methods utilized by the Company can take many years to fully develop and are heavily dependent on the timely issuance of permits from

local and federal governments.  As such, the Individual Defendants repeatedly represented to stockholders in the Company's public filings with the SEC and otherwise that mitigating the risk of permitting delays was one of the core elements of Berry's business strategy.

4.     The Company went public pursuant to an initial public offering (the "IPO") at the start of the Relevant Period on July 26, 2018.  The Individual Defendants caused the Registration Statement used to sell Berry shares in the IPO to be materially false and misleading in two critical respects: (1) the Registration Statement contained misleading statements about the potential risk of permitting delays and Berry's inability to drill oil in identified sites when these risks had either already occurred or had a high risk of occurring in the near future; and (2) the Registration Statement failed to disclose chronic internal deficiencies -- which existed well before Berry went public on July 26, 2018 -- that prevented Berry from obtaining certain permits, the disclosure of which was mandated by SEC Regulation S-K.

5.     It is alleged in the operative complaint of the sustained securities fraud class action pending in this Court against Berry and certain of the Individual Defendants named herein, captioned *Torres, et al. v. Berry Corp. et al.,* Civil Action No. 3:20-CV-3464-S (the "Securities Action"), based on the accounts of confidential witnesses ("CWs") referred to therein as "CW4,"[1] "CW5"[2] and "CW7",[3] that several months before the IPO, Berry had already experienced severe delays in securing permits that threatened production, and that CW5 presented a Strengths,

---

[1]     CW4 is described in the operative complaint in the Securities Action as a former Planning Analyst and Process Controller at Berry who was later promoted to Regulatory Supervisor, and who was employed at Berry from March 2018 until November 2020.

[2]     CW5 is described in the operative complaint in the Securities Action as having worked as an Engineering Lead at Berry between April 2016 and March 2019.

[3]     CW7 is described in the operative complaint in the Securities Action as a contractor-consultant at Cornerstone Engineering, Inc. ("Cornerstone"), who was retained to serve as a third-party consultant by Berry from December 2017 to May 2021.

Weaknesses, Opportunities and Threats ("SWOT") analysis to the highest level of management, which identified that the repeated failure to secure timely permits was a major threat to Berry's business.

6.      After the Company went public in late July 2018 via the IPO, over a span of two years between August 2018 and August 2020, the Individual Defendants made materially false and misleading statements on nearly a dozen occasions, assuring stockholders that Berry's ability to secure permits was a non-issue.  For example, during Berry's "Investor Day" held in May 2019, defendant Gary A. Grove ("Grove"), the Company's then-Chief Operating Officer ("COO"), spoke at length about the Company's process for obtaining permits and represented to stockholders that "we don't have a permitting problem," while defendant Arthur T. ("Trem") Smith ("Smith"), Berry's Chairman, President, and Chief Executive Officer ("CEO"), went even further, stating: "*So we do not have a permitting problem, as Gary said five times at least I'll say it another 20 times*." (Emphasis added).

7.      Subsequently, between the end of 2019 and early 2020, when analysts asked specific, pointed questions about the Company's permitting delays, defendant Grove repeatedly referred to the delays as a "tiny issue" and misleadingly claimed the delays were associated with a specific permit required only for hydraulic fracturing ("fracking"), but that there were no delays or other problems with obtaining any other types of permits.

8.      The Company's Annual Report for Fiscal Year 2019 on SEC Form 10-K (the "2019 10-K"), filed in February 2020 and signed by each member of the Board -- which notably at that time included *a majority of the Company's current directors* -- contained inconsistent admissions which rendered the Individual Defendants' earlier statements false when made.

9.      Specifically, in the 2019 10-K, the Individual Defendants – including a majority

of Berry's current Board members -- admitted that Berry experienced delays in obtaining Underground Injection Control Permits ("UIC Permits"), a permit required to inject steam into oil wells to increase production, but the Individual Defendants deflected the blame for the delay on regulatory changes.  Even this half-truth was materially misleading, however, based on the following facts:

- Per the accounts of the CWs referred to as CW1,[4] CW4, and CW5 in the operative complaint in the Securities Action, the Company's delays in obtaining UIC Permits were not caused by any alleged regulatory changes.  According to the account of CW5, by no later than 2019, the failure to obtain timely permits was principally the fault of Berry's senior management.

- According to detailed accounts of numerous CWs in the Securities Action, timely permits were not obtained because of: (a) the failure to plan sufficient lead time to secure UIC Permits, which take several years to obtain; (b) repeated submission of faulty data in the Company's application packages, leading to denial by local regulators; (c) defendant Grove's decision to flout regulations which required producers to obtain UIC Permits for cyclic steam wells; and (d) incorrect well plans that caused a mismatch between the actual location of the wells and the location of the corresponding permit.

- Per the account of the CW referred to as CW3[5] in the Securities Action, the failure

---

[4]    CW1 is described in the operative complaint in the Securities Action as a chemical engineer who was employed by Berry as a Drilling Operations Manager between August 2019 and November 2020.

[5]    CW3 is described in the operative complaint in the Securities Action as having worked as an Environmental and Regulatory Manager at Berry from June 2019 to September 2021.

to obtain permits became a drastic problem at Berry by no later than June 2019.

- According to the accounts of numerous CWs in the Securities Action, the repeated failure to secure UIC Permits was pervasive and had negative, tangible consequences for the Company. For instance, per the account of CW1, Berry ceased production on two rigs in the Fall of 2019 due to the failure to account for the necessary lead time to acquire permits. Per the account of the CW referred to as "CW2",[6] the failure to obtain UIC Permits caused the write-down of Berry's reserves. Per the account of the CW referred to as "CW6",[7] the failure to acquire UIC Permits caused Berry to fall behind on production for desired wells. And per the account of CW7, a neutral third-party consultant hired to address permitting problems, Berry could not inject steam and increase production because of a lack of UIC Permits in at least hundreds of wells between January 2019 and May 2020.

10.    The failure to obtain permits caught up with Berry by early 2020, and in April 2020, the Individual Defendants abruptly announced that Berry would drastically slash its capital expenditures and then targeted production to remain flat to 2% down for Fiscal Year 2020 due to "current market conditions." This plan remained in effect for Fiscal Year 2021 and part of Fiscal Year 2022, even after the economy rebounded and oil prices skyrocketed.

11.    According to the account of CW4 in the Securities Action, however, during 2020,

---

[6]    CW2 is described in the operative complaint in the Securities Action as a former Senior Engineer who later served as a Production Manager at Berry between November 2017 and June 2021.

[7]    According to the operative complaint in the Securities Action, CW6 joined Berry in August 2012 and departed the Company in August 2020. CW6 first worked at Berry as a Production Engineer, then as a Field Manager, and then as an Asset Manager beginning in February 2019.

*it was concealed from stockholders that the revised plan to reduce production for the next two years was presented to the Board as a cost reduction measure, before the first lockdown was instituted in California and well before the economy began to experience any negative consequences from the COVID-19 pandemic.* As alleged herein, a majority of the Company's current directors have served on the Board since prior to 2020.

12.     Nevertheless, even after April 2020, the Individual Defendants continued making false statements to stockholders and/or withholding material information about the permitting process and the number of permits the Company purportedly had on hand. According to the accounts in the Securities Action of CW1 and CW4, the number of permits on hand which was touted to stockholders in the Summer of 2020 was false, because these purported permits were either obtained for the wrong location or because the wells could not be steamed to increase production due to a failure to obtain UIC Permits.

13.     The CW accounts set forth in the operative complaint in the Securities Action, from sources that are described as having directly reported to and/or regularly interacted with certain of the Individual Defendants, demonstrate that the Individual Defendants either had actual knowledge of the truth when they made their false and misleading statements detailed herein, or were reckless as to the truth of their statements:

- It is alleged that CW1, who is described as having directly reported to defendant Grove, regularly met with certain Individual Defendants in person and took written notes of discussions with them, some of which CW1 shared with the plaintiffs to the Securities Action. In early 2019, Berry hired Megan Silva ("Ms. Silva") to oversee the Company's permitting process, which defendant Smith touted to stockholders as a "monster move." According to the operative complaint

in the Securities Action, a note from a March 4, 2020 meeting attended by CW1, Ms. Silva, defendant Smith, and defendant Cary Baetz ("Baetz"), a Board member and Berry's Chief Financial Officer ("CFO"), states that Ms. Silva warned that Berry's permitting process and production targets did not match the actual permit flow and implementation plan and that, as a result, Berry would miss its production targets.

- It is alleged in the Securities Action that, according to another contemporaneous note of an October 17, 2019 meeting attended by CW1, Ms. Silva, and defendants Smith and Baetz, Ms. Silva and CW1 informed defendants Smith and Baetz that Berry's well inventory did not align with the permitting. According to CW1, during this meeting CW1 and Ms. Silva told Smith and Baetz that over 90% of the permits in the pipeline were unprofitable. As a result, it is alleged that defendant Grove directed CW1 to drill at second tier locations.

- It is also alleged that CW1 repeatedly warned defendants Smith and Grove in emails about the magnitude of the Company's permitting problems starting, at least, in the Summer of 2019. CW1, who is described as having met with defendant Grove on a weekly basis, also is alleged to have shared with the Securities Action plaintiffs text messages that CW1 sent to Grove, and which Grove responded to, warning about the failure to build lead time to mitigate the external regulatory barriers.

- It is alleged that CW3 repeatedly raised concerns about the Company's failure to obtain timely permits in meetings with defendants Smith, Baetz, and Grove, and that on at least one occasion at these meetings, defendant Smith chastised Berry

7

employees for failing to obtain timely permits.

- It is alleged that CW4 also regularly met with defendants Smith, Baetz, and Grove to discuss how the Company's failure to obtain permits negatively impacted production and told them about the reasons why Berry failed to secure UIC Permits. CW4 is alleged to have created a dashboard with granular data on a Microsoft Excel file for sites that Berry intended to drill, the types of wells located in those sites, and specific details about permit submissions. This dashboard contained completion deadlines for permits and tracked projects that fell behind schedule. CW4 is alleged to have showed the information on this dashboard to defendants Smith and Grove on a regular basis during in-person meetings.

14.     While the Individual Defendants continued to conceal the full truth about the Company's severe permitting problems, the truth began to emerge through a series of partial disclosures and/or materializations of concealed risks.   On April 1, 2020, the Individual Defendants caused the Company to abruptly issue a press release announcing that due to "current market conditions," the Company's 2020 production target was revised significantly downwards, with growth expected to remain flat to 2% down.  On this news, Berry's stock price declined by over 16.6% from its previous day closing price of $2.41 per share on March 31, 2020, to close at $2.01 per share on April 1, 2020.

15.     On August 4, 2020, the Individual Defendants caused the Company to announce that average daily production decreased by an additional 5% for the second quarter of 2020 compared to the first quarter of 2020.  On this news, the Company's stock price declined by over 7% from its previous day closing price of $4.90 per share on August 4, 2020, to close at $4.55 per share on August 5, 2020.

16.     On November 3, 2020, the Individual Defendants caused the Company to announce that average daily production decreased yet again by 5% for the third quarter of 2020 compared to the second quarter of 2020. On this news, the Company's stock price declined by over 5% from its previous day closing price of $2.84 per share on November 3, 2020, to close at $2.69 per share on November 4, 2020.

17.     These revelations precipitated the initiation of the Securities Action in this Court, in which various claims under the federal securities laws, including claims for fraud, were asserted against Berry and several of the Individual Defendants named herein – Smith, Baetz, Grove, Brent S. Buckley ("Buckley"), Kaj Vazales ("Vazales"), and Eugene Voiland ("Voiland").   The Securities Action was brought on behalf of two classes of investors: (a) investors who purchased shares of Berry common stock pursuant and/or traceable to the Registration Statement issued in connection with the IPO, and/or (b) investors who purchased or acquired shares of Berry stock from July 26, 2018 through November 3, 2020 (the "Class Period").

18.     On September 13, 2022, the defendants' motion to dismiss the Securities Action was ***denied in its entirety***, notwithstanding the materially heightened pleading standards applicable to the Securities Action pursuant to the Private Securities Litigation Act of 1995 (the "PSLRA"). In sustaining the Securities Action, this Court concluded that the plaintiffs sufficiently alleged a series of misleading statements or omissions during the Class Period – the very same disclosures which Plaintiff challenges herein – as well as the "***requisite strong inference of scienter***" on the part of the defendants.

19.     Accordingly, Berry and each of the individual defendants to the Securities Action (Smith, Baetz, Grove, Buckley, Vazales, and Voiland) are now staring down the barrel of claims sustained against them under Sections 11 and 15 of the Securities Act of 1933 (the "Securities

Act") and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), as the Securities Action proceeds towards trial.

20.    As alleged herein, under Delaware law, there is reason to doubt in these circumstances that at least half of the members of the Company's current Board could disinterestedly and/or independently respond to a litigation demand.  As a result, this derivative action brought against the Individual Defendants for the benefit of Berry should proceed.

## II.    JURISDICTION AND VENUE

21.    This Court has jurisdiction under 28 U.S.C. §1331 because certain of the claims asserted herein arise under §§10(b) and 21D of the Exchange Act.

22.    This Court also has supplemental jurisdiction over the state law claims asserted herein under 28 U.S.C. §1367.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

23.    In connection with the acts, conduct and other wrongs complained of herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, the United States mail, and the facilities of a national securities market.

24.    Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. §1391(b) because nominal defendant Berry is headquartered in this District and conducts business in this District.

## III.    THE PARTIES

### A.    Plaintiff

25.    Plaintiff is a current shareholder of Berry and has continuously held shares of Berry common stock since 2018.

### B.    Nominal Defendant

26.    Nominal defendant Berry is a Delaware corporation with its principal executive

offices located in Dallas, Texas. The Company's common stock trades on the NASDAQ exchange under the symbol "BRY."

### C. The Individual Defendants

27.    Defendant Smith has served as President and CEO of Berry and as a director of the Company since March 2017. Since February 2019, defendant Smith has also served as Chairman of the Board. Defendant Smith is named as an individual defendant in the sustained Securities Action.

28.    Defendant Baetz has served as an Executive Vice President ("EVP") and as CFO of the Company since June 2017. Defendant Baetz has also served as a member of the Board since June 2017. Defendant Baetz is named as an individual defendant in the sustained Securities Action.

29.    Defendant Grove served as an EVP and as the Company's COO from May 2017 until his "retirement" in September 2020. Defendant Grove is named as an individual defendant in the sustained Securities Action.

30.    Defendant Buckley served as a director of the Company from February 2017 until he resigned, effective immediately, on March 18, 2022. Defendant Buckley previously served as Chairman of the Board from June 2017 until February 2019. Defendant Buckley is named as an individual defendant in the sustained Securities Action.

31.    Defendant Vazales served as a director of the Company from February 2017 until he resigned in September 2018. Defendant Vazales is named as an individual defendant in the sustained Securities Action.

32.    Defendant Voiland served as a director of the Company from June 2017 until his retirement in May 2021. Defendant Voiland is named as an individual defendant in the sustained Securities Action.

33.     Defendant Anne Mariucci ("Mariucci") has served as a director of the Company since September 2018.

34.     Defendant Donald Paul ("Paul") has served as a director of the Company since February 2019.

35.     Defendants Smith, Baetz, Grove, Buckley, Vazales, Voiland, Mariucci, and Paul are collectively referred to herein as the "Individual Defendants."

## IV.     DUTIES OF THE INDIVIDUAL DEFENDANTS

36.     By reason of their positions as officers and/or directors of the Company, and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its stockholders the fiduciary obligations of good faith, trust, loyalty, and due care, and were, and are, required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were, and are, required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interests or benefit.  Each director and officer owed to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

37.     The Individual Defendants, because of their positions of control and authority as directors and/or officers, were able to, and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

38.     At all times relevant hereto, each of the Individual Defendants was the agent of the other Individual Defendants and of the Company and was at all times acting within the course and scope of such agency.

39.    To discharge their duties, the Individual Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the financial affairs of the Company.  By virtue of such duties, the Individual Defendants were required to, among other things:

a.    manage, conduct, supervise and direct the business affairs of the Company in accordance with all applicable laws;

b.    neither violate, nor knowingly permit any officer, director or employee of the Company to violate, applicable laws, rules and regulations;

c.    establish and maintain systematic and accurate records and reports of the business and affairs of the Company and procedures for the reporting of the business and affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

d.    neither engage in self-dealing, nor knowingly permit any officer, director or employee of the Company to engage in self-dealing;

e.    ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

f.    conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

g.    ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times; and

h.    remain informed regarding how the Company conducted its operations, and,

upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices and make such disclosures as necessary to comply with applicable laws.

40.     Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and its stockholders the fiduciary duties of loyalty, good faith, the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants alleged herein involves a violation of their obligations as directors and/or officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware, or should have been aware, posed a risk of serious injury to the Company. The conduct of the Individual Defendants, who were also officers and/or directors of the Company, has been ratified by the remaining defendants.

## V.    FACTS

### A.    Background of the Company and Its Business

41.     Nominal defendant Berry is an energy company which develops and produces conventional oil reserves in the western United States.  As of December 31, 2020, the Company had 347 employees.  The Company's predecessor, Berry Petroleum Co., went public in 1989, but subsequently filed for bankruptcy on May 11, 2016.  In February 2017, Berry LLC appeared out of the bankruptcy as a stand-alone company and wholly-owned subsidiary of Berry, which was incorporated in Delaware in the same month.  In late July 2018, Berry completed its IPO and its common stock began to trade publicly on the NASDAQ exchange.

42.     The vast majority of the Company's asset base consists of oil reserves in the San Joaquin Basin in California, with over 90% of its total proved reserves located in that state.  Berry's

remaining proved reserves are located in Utah and Colorado.  Throughout Berry's history as a public company, the Individual Defendants have touted the low-risk profile of the Company's properties given that its wells have produced oil for decades, particularly in California, as well as the fact that the Company exercises operational control over virtually all its producing wells, enhancing a high degree of flexibility towards executing business plans, meeting budget targets, allocating capital expenditures and the marketing of production. With similar enthusiasm, the Individual Defendants have routinely touted Berry's "experienced, principled and [] disciplined management team" as another source of the so-called "Berry Advantage" that allows Berry to "optimize" the value of its assets and business.

43.     California, where virtually all the Company's asset base is located, is one of the most regulated states in the country.  To drill wells in California, an oil producer is required to obtain a variety of permits from the California Geologic Energy Management Division ("CalGEM").  As the Individual Defendants have repeatedly acknowledged publicly, the recovery methods that Berry utilizes take several years to fully develop and heavily depend on the timely issuance of permits from regulatory bodies at the federal and state level. A failure to secure regulatory approval or permits in a timely manner inevitably has a severely negative impact on production and the Company's present and future business prospects.

44.     Throughout the Relevant Period, the Individual Defendants repeatedly represented to stockholders via the Company's public SEC filings and investor conference calls that Berry interfaced and worked closely with regulators on the front end of the process to mitigate the risk of permitting delays.  Indeed, the Individual Defendants claimed that mitigating the risk of permitting delays was one of six principal elements of Berry's business strategy in each of the Company's Annual Reports on Form 10-K filed with the SEC for the Fiscal Years 2018, 2019 and

15

2020.

### B.    The Regulatory Landscape For Permits

45.    Thermal wells require heat, in the form of steam, to efficiently generate oil. According to Berry's Annual Report filed on SEC Form 10-K for Fiscal Year 2018 (the "2018 10-K"), the Company's assets in California "consist of heavy crude oil, which requires heat, supplied in the form of steam, injected into the oil producing formations to reduce the oil viscosity, thereby allowing the oil to flow to the wellbore for production." *See* 2018 10-K at 10.

46.    As of December 31, 2018, Berry had 7,030 drilling locations. 4,066 of its California locations required thermal recovery, and 1,766 of those were thermal diatomite wells and 2,300 were thermal sandstone wells.  Likewise, as of December 2019, Berry had 10,859 drilling locations, and 6,143 of those were thermal sandstones and 3,198 were thermal diatomite wells.  *See* 2019 10-K at 19.  Berry's drilling locations in California continue to be "primarily focused on [] thermal Sandstones, thermal Diatomite and Hill Diatomite."  *See* Berry Corp. Form 10-K for Fiscal Year 2020 at 19 (the "2020 10-K").

47.    Diatomite is a "soft, silica-rich sedimentary rock comprising diatom remains that forms most commonly in lakes and deep marine areas."[8]  Sandstone is a "clastic sedimentary rock whose grains are predominantly sand-sized."[9]

48.    In California, separate permits are required to drill and steam wells.  CalGEM is the chief regulator of permits in the state.  Moreover, a county where the drilling site is located may require permits for oil and gas drilling ("Drilling Permits"), and drilling on federal land

---

[8]    *See Oilfield Glossary- Diatomite*, Schlumberger, https://glossary.oilfield.slb.com/en/terms/d/diatomite.

[9]    *See Oilfield Glossary- Sandstone*, Schlumberger, https://glossary.oilfield.slb.com/en/terms/s/sandstone.

requires a permit from the Bureau of Land Management ("BLM").

49.     Steam injection is the main type of thermal stimulation of oil reservoirs.  There are several different forms of the technology, with the two main ones being cyclic steam stimulation and steam flooding.  Both are most commonly applied to oil reservoirs, which are relatively shallow and contain crude oils that are very viscous at the temperature of the native underground formation.  Steam injection is widely used in the San Joaquin basin.[10]  Steam flooding and cyclic stimulation work as follows:



Source: Wikipedia, Oil and Gas News

50.     As demonstrated above, steam flooding involves injecting the reservoir with steam to create hot water, pushing the oil to reduce its viscosity, so it can be produced from the oil

---

[10]     *See* https://en.wikipedia.org/wiki/Steam_injection_(oil_industry).

producing well. Cyclic steam stimulation involves injecting steam into the reservoir with one well, heating the oil, and then pumping the heated oil into the surface from the same well.

51.     To inject steam into oil producing formations, an oil producer must have a UIC Permit. As defendant Grove explained at the Company's Investor Day Conference in May 2019, a UIC Permit "allows us to inject fluids and allows us to inject steam, allows us to inject water. [W]e need that permit. You get it, it covers a certain area." (May 16, 2019 Investor Day Conference Transcript at 32). As the California Department of Conservation has explained, "[i]njection is often accomplished in a manner that will increase oil and gas production."[11] UIC Permits also regulate the amount of water that an oil producer can dispose of during the drilling and production process.

52.     At the Company's Investor Day Conference held on May 16, 2019, defendant Grove claimed it generally takes "6 months to 12 months" to obtain a UIC Permit. (May 16, 2019 Investor Day Conference Transcript at 32). However, according to the accounts of numerous CWs in the Securities Action, the amount of time required was substantially longer than 6 to 12 months, demonstrating the urgent need to build sufficient lead time in advance of drilling at a particular location.

53.     For instance, as alleged in the Securities Action, CW1 served as a Drilling Operations Manager at Berry between August 2019 and November 2020, and directly reported to defendant Grove. CW1 is described in the operative Securities Action complaint as a chemical engineer who has worked in the oil and gas industry for approximately 20 years. CW1 is alleged to have managed Berry's drilling sites and well completions and to have overseen the Company's

---

[11]     *See Injection Wells - Frequently Asked Questions*, CALIFORNIA DEPARTMENT OF CONSERVATION,
https://www.conservation.ca.gov/calgem/general_information/Pages/class_injection_wells.aspx.

abandonment and workover teams. Per the account of CW1, UIC Permits have one of the longest lead times and it can take between 12 to 24 months to obtain them. Further, according to CW1, seeking approval for UIC Permits from CalGEM is a time-intensive and laborious process, which required the Company to demonstrate that all wells in a given area are deemed competent with no mechanical integrity issues. CW1 further explained that ultimate approval for a UIC Permit often requires the wells to be pressure tested or involves the inclusion of cement bond logs that confirm the integrity of the area. Additionally, according to CW1, the UIC Permit process requires a robust risk analysis of the conditions of every wellbore within the area of review.

54.     The operative complaint in the Securities Action describes CW2 as having served as a Senior Engineer and then as a Production Manager at Berry between November 2017 and June 2021. As a Production Manager, CW2 is alleged to have supervised all production engineers at Berry. CW2's principal responsibility was to ensure that actual oil production met the Company's forecasts for each specific month. According to the Securities Action, CW2 worked out of Berry's Bakersfield, California office, and reported to the Company's Vice President of Operations, Kent Fink, who in turn directly reported to defendant Grove. CW2 states that it took between two to five years for Berry to procure UIC Permits.

55.     The operative complaint in the Securities Action describes CW3 as having served as an Environmental and Regulatory Manager at Berry from June 2019 to September 2021. It is alleged that CW3 supervised various aspects of regulatory compliance and permitting at Berry, and directly reported to Ms. Silva, who later became Berry's EVP of Regulatory and Corporate Affairs and was identified as one of the key members of management on Berry's website before her departure from the Company in mid-2021. Defendants Smith and Grove represented to stockholders that Ms. Silva was the key individual at Berry responsible for executing on a well-

planned strategy to procure timely permits.  According to the account of CW3, it took Berry between two to three years to get a UIC Permit approved.

56.     Berry was also required to obtain a variety of other permits.  For example, regulations in California required the Company to secure Well Stimulation Treatment Permits ("WST Permits") for fracking.  Oil and gas operators sometimes use fracking when pore space in the rock making up the oil or natural gas reservoir is too tight to allow the flow of fluids or gasses to the well.  *See* Well Stimulation Treatment, California Dept. of Conservation, https://www.conservation.ca.gov/calgem/Pages/WST.aspx.  On November 19, 2019, California issued a moratorium on any new fracking and high-pressure cyclic steam permits. This moratorium applied only to new applications.

### C.    Berry's Chronic Internal Deficiencies Result in Failure to Secure Timely Permits

57.     Per multiple CW accounts in the operative complaint in the Securities Action, several former employees with knowledge of Berry's permitting problems and a third-party consultant at Cornerstone who worked closely on permitting issues confirmed that Berry had severe problems with securing timely permits and that these problems negatively impacted the Company's production levels and targets.

58.     According to the account of CW1 in the Securities Action, the Company experienced significant declines in production because of its inability to secure permits for both drilling as well as for injecting steam.  Between August 2019 and November 2020, CW1 states that drilling was significantly impeded because of Berry's failure to secure timely permits. Specifically, CW1 has recounted that Berry ceased production at two rigs in the Fall of 2019 because the Company failed to secure the required permits. CW1 attributed this failure to the Company's inability or unwillingness to properly account for the necessary lead time in acquiring

the permits.  CW1 explained that the lead time needed to be at least twelve months, but Berry frequently fell behind on its plans and did not even have a three-month lead time in place to drill wells pursuant to the schedule.  CW1 further explained that when Berry failed to hit its internal production targets because of a lack of permits, the Company would then simply revise its forecast. According to CW1, at Aera Energy LLC ("Aera"), CW1's prior employer, CW1 never ceased production due to a failure to receive timely permits.  In contrast, CW1 personally had to idle two of Berry's three rigs because of a lack of timely permits. As another example, CW1 states that Berry drilled 40 wells that required the injection of steam at the Olig Potter formation and spent $20 million drilling the wells, but failed to obtain UIC Permits, creating serious water disposal constraints and ultimately limiting its ability to produce oil.  CW1 is alleged to have warned the defendants to the Securities Action about the unprofitability of drilling these wells six months before they were actually drilled.

59.    On April 1, 2020, after previously conditioning stockholders to expect double digit growth in production in California, the Individual Defendants caused Berry to issue a press release that purported to provide updated guidance due to "current market conditions" and revised targeted production for 2020 to be flat to down 2%.  While the Individual Defendants nonetheless claimed in this press release that Berry continued to file for and receive various permits to increase its available inventory, according to the account of CW1 in the Securities Action, pre-existing problems were masked and hidden from stockholders, including how the chronic failure to secure permits caused radical change to the Company's plans even without the "current market conditions."  CW1 notes that Berry's production targets and capital expenditure plans were regularly revised when stated goals were not met.

60.    According to the Securities Action, CW1 further stated that the number of actual,

available permits that Berry had received was frequently misrepresented. For example, in the Summer of 2020, Berry's public filings touted that the Company had received hundreds of permits, but, according to CW1, it was not disclosed that the Company failed to obtain the UIC Permits necessary to inject steam into the wells. CW1 reported that 95% of the permits publicly touted were illusory because Berry either failed to obtain UIC Permits or obtained Drilling Permits for the wrong location, known as the area of review ("AOR"), because the geologist had changed the location before drilling commenced, thus requiring the permit application to be resubmitted. The Securities Action alleges that CW1 directly told defendant Grove about these specific problems on a regular basis. CW1 also states that Berry regularly fell behind on obtaining UIC Permits, yet drilled for heavy oil in wells without using any steam. Because Berry lacked the UIC Permits for these wells and could not steam them, production in the wells precipitously declined. According to CW1, this specific problem was prevalent in the Olig Potter, Fairfield, Southwestern, and Hill wells.

61.     CW1 further asserts that in 2020 the defendants to the Securities Action provided misleading figures for the number of permits that the Company had obtained, because the actual drilling sites lacked the necessary permits, including UIC Permits, that would allow the Company to increase production.

62.     CW2's account in the Securities Action confirms CW1's account that the failure to secure permits and poor well management caused serious declines in production levels. CW2 further states that Berry's failure to secure required UIC Permits not only lowered production, but also caused the write-down of the Company's reserves. According to CW2, once Proved Undeveloped Reserves are booked with the SEC, the driller has five years to drill the wells before the permits expire, and Berry's repeated failure to secure timely permits within the five-year

window caused the number of its proved reserves to decline. CW2 also states that Berry's diatomite assets were written down because of a lack of permits. While Berry's booked reserves were reported to stockholders, according to CW2, Berry failed to acquire the necessary UIC Permits and other permits to actually drill the wells.

63.     The Securities Action alleges, based on the account of CW2, that between late 2019 and early 2020, to dampen the impact of lower production, an illegal scheme was perpetrated in order to inject hot water into wells for which Berry did not have UIC Permits. CW2 explained that injecting hot water into a well reduces the viscosity of the heavy oil and thereby improves production. CW2 further explained that injecting hot water into a producing well is illegal unless required to remedy a well control issue, such as to limit oil backflow, or to intervene by freeing rods from thick oil. CW2 noted that CalGEM fines companies that utilize hot water for production. According to CW2, this risky and illegal endeavor to improve production on underperforming wells was undertaken at Berry, and that this trend first began in Potter, but now hot water is used on a Company-wide basis.

64.     According to the account of CW2 in the Securities Action, in the Summer of 2020 Berry was unable to drill wells in the Pliocene formation because Berry needed UIC Permits to drill the heavy oil but failed to obtain them. CW2 blamed the failure to secure the UIC Permits on a breakdown of internal processes at the Company. CW2 states that Berry did not utilize another rig for drilling new wells between April 2020 and October 2020, principally due to the failure to secure the necessary permits rather than a general downturn in the industry. CW2 further recounted that several measures to uneconomically increase production were taken at Berry due to the permitting problems. According to CW2, applications for permits in connection with unprofitable wells were regularly submitted between July 2018 and November 2020, and due to Berry's failure

to secure UIC Permits and other permits to increase production, Berry's actual oil production was frequently overestimated. Even in November 2020, CW2 describes how the new COO of Berry who replaced defendant Grove, Fernando Araujo, initiated a "workover program" to fix old wells suffering from reduced production primarily caused by poor planning and a failure to secure timely permits. It is alleged that as of October 2021, then-current Berry employees told CW2 that this second-rate solution continued to be pursued, and that Company resources continued to be dedicated to unprofitable, old wells to mitigate the effects of lost production due to a failure to secure permits.

65.    Strikingly, the account of CW2 in the Securities Action confirms that Berry's systemic internal deficiencies and repeated failure to obtain the necessary permits continued well past November 2020, and may well still exist. As of late 2021, CW2 reported that Berry had 17 incomplete applications for UIC Permits but had only initiated the process to obtain two of them. CW2 further reported that Berry did not seriously increase its effort to secure UIC Permits until March 2021.

66.    The account in the Securities Action of CW3, Berry's former Environmental and Regulatory Manager, confirms that the failure to secure timely permits remained a major issue at the Company even when CW3 left the Company in September 2021. CW3 explained that Berry failed to implement written processes for navigating permits, which made the permitting process difficult to execute. CW3 is alleged to have tried to implement best practice business strategies that CW3 learned while working at another oil company, such as flow diagrams and win-loss charts. However, CW3 reported that Berry's management was not receptive to implementing CW3's recommendations. Berry eventually used a software solution called Generwell, but according to CW3, resistance from senior management yet again hampered the implementation of

this project.

67.     The account of CW3 also confirmed the accounts of other CWs in the Securities Action that Berry drilled wells that required steam but could not use steam because of a lack of UIC Permits. According to the Securities Action, CW3 believes that the failure to obtain permits became a drastic problem at Berry long before CW3 joined the Company in June 2019. According to CW3, the UIC Permit review process and approval slowed to a virtual halt in 2019 because defendant Grove claimed that cyclic steam wells did not require UIC Permits even though the regulations clearly defined cyclic steam wells as injection wells.  As a result, Berry applied for a normal oil and gas permit for a cyclic steam well and then operated the well as a normal oil and gas well, knowingly foregoing the steam enhancement necessary to drive the anticipated production.

68.     The account of CW3 also corroborates CW1's account that Berry used only conventional drilling techniques in the Olig Potter lease.  These wells contained heavy oil and also needed steam injection, but CW3 concurred with CW1 that Berry was forced to utilize conventional drilling because of the failure to obtain UIC Permits.  As a result, Berry produced substantially less oil in these wells.

69.     According to the account of CW3, CalGEM frequently contacted managers at Berry via email, including CW3, criticizing the Company for submitting faulty and unreliable data in the permitting packages and requiring Berry to resubmit the packages after rectifying the errors, causing further delays. CW3 states that the most significant feedback received from CalGEM regarding the poor data in the permitting packages was in the Summer of 2021. At that time, a senior reviewer from CalGEM sent an email to CW3 concerning the poor data in Berry's permitting packages. CW3 is alleged to have printed this email and delivered it personally to

25

defendant Smith's administrative assistant.

70.     CW4 is described in the Securities Action as a Planning Analyst and Process Controller who was promoted to a Regulatory Supervisor, that worked at Berry from March 2018 to November 2020.  As a Regulatory Supervisor starting in September 2020, CW4 was responsible for coordinating the process of receiving permits for wells. CW4 worked out of the Company's Bakersfield, California office and directly reported to Ms. Silva, who in turn directly reported to defendant Smith and participated in weekly roundtable discussions with defendant Smith.  CW4 is alleged to have led weekly meetings with senior management to provide updates on Berry's long-term planning process for obtaining permits. According to CW4, Ms. Silva and defendant Baetz attended these meetings.  CW4 also is alleged to have met on a weekly basis with defendant Grove to discuss the status of permits.  In 2019, CW4 is alleged to have developed a Long Lead Planning Dashboard ("LLPD") to track permitting on well sites.  CW1 confirmed the existence of the LLPD and noted that it was originally a tool used by Aera which was subsequently adapted by Berry.

71.     The account in the Securities Action of CW4 corroborates CW1's account that the production of oil was negatively impacted at Berry due to a failure to secure timely permits. In fact, CW4 confirmed that Berry's systemic internal deficiencies which caused the Company to fail to secure timely permits existed in the Spring of 2018 -- months before the IPO. Specifically, CW4 recalls conversations with senior management in April 2018 concerning how wells had either been permitted incorrectly, permitted in the wrong drilling location, or otherwise needed to be reevaluated with a requirement that a new application for permits be submitted to regulators.

72.     It is alleged in the Securities Action that in the Spring of 2019, CW4, Ms. Silva, and other managers at Berry regularly discussed, in conversations as well as in formal meetings,

how Berry's permitting problems did not lie with the regulatory bodies but instead were due to Berry's own failure to acquire the necessary permits in a timely manner. CW4 also reported that during this time, wells had not been planned correctly relative to the area for which they were permitted. These discussions allegedly continued into 2020 and Berry's permitting problems were still not rectified. CW4 confirmed that Berry specifically and repeatedly failed to obtain UIC Permits. According to CW4, the Operations group at Berry knowingly included wells in the Company's forecasts that would not be drilled because UIC Permits had not been obtained and the wells could not be steamed. As a result, producible oil in the wells was dramatically lower than forecasted. CW4 confirms that the failure to obtain UIC Permits constrained the amount of water that could be disposed, which ultimately harmed production. The account of CW4 also corroborates CW1's account that the defendants to the Securities Action misrepresented the number of permits on hand because many of these permits were associated with uneconomic wells. For example, CW4 confirms that the Company lost money on wells located in Olig Potter.

73.    According to the account of CW4, well before the outbreak of the COVID-19 pandemic and months before the first stay-at-home order took effect in California on March 19, 2020, the defendants to the Securities Action initiated a cost reduction plan at Berry because they knew the Company would not meet its production targets due to the repeated failure to secure the necessary permits. It is alleged that *this cost reduction plan was presented to the Board in the Spring of 2020*, several months before the announcement of revised guidance and downward projection of production targets was publicly announced in April 2020. Each division at Berry was tasked at the time with promulgating an individualized cost savings plan, and CW4 is alleged to have received an email from the defendants to the Securities Action with those instructions. According to CW4, stockholders were misled by the public attribution of Berry's production

decline to deteriorating macroeconomic conditions, and the failure to disclose that Berry's failure to secure the necessary permits in order to drill wells was a pre-existing and systemic problem that existed for years.

74.    CW5 is described in the Securities Action as having worked as an Engineering Lead at Berry between April 2016 and March 2019. CW5 is alleged to have reported to Berry's Asset Manager, Zac Hale, who in turn directly reported to defendant Grove. CW5's main responsibilities included managing the development of assets and optimizing value through cost reduction and product improvement. According to the account of CW5, permitting at Berry started to become difficult in late 2017 and early 2018, approximately six months before the Company went public. CW5 noted that there were weekly meetings to review outstanding permits for submission and to direct rigs accordingly; however the packages were not ready with sufficient lead time as they were often only one week ahead of drilling the rig, when the norm is to procure them at least one year in advance. As a result, CW5 stated that the Company would constantly rearrange the rig schedule and move wells back and forth to determine which wells needed permits. In the middle of 2018 and before the Company went public, CW5 also is alleged to have performed a SWOT[12] analysis which showed that Berry's failure to secure timely permits was a threat to its business. According to the Securities Action, CW5 presented the SWOT analysis to a steering committee, that consisted of management at the highest levels, before the Company went public. CW5 further asserts that, by no later than 2019, the failure to secure timely permits was principally the fault of senior management at Berry and not due to any changes in the regulatory environment.

75.    The Securities Action alleges that CW6 joined Berry in August 2012 and left the Company in August 2020, and that CW6 first worked at Berry as a Production Engineer, then as

---

[12]    A "SWOT" analysis is a commonly used business planning and decision-making technique which identifies: (i) Strengths; (ii) Weaknesses; (iii) Opportunities; and (iv) Threats.

a Field Manager, and then as an Asset Manager beginning in February 2019.  As an Asset Manager, CW6 oversaw operations for 10,000 daily barrels of oil, and oversaw the technical staff that supported operations and development plans for the South Midway-Sunset asset. CW6 directly reported to defendant Grove and attended long-term planning meetings held every week to discuss permitting, as well as budgeting meetings with senior management in which permitting was discussed.  CW6 confirms that Berry lost production in wells because of its inability to acquire UIC Permits.  According to CW6, because Berry's lead time was poorly planned, the Company frequently fell behind on permitting for desired wells.

76.     According to CW6, it was widely known within Berry in 2019 and 2020 that UIC Permit regulations were changing, and that permit applications needed to align with the new standard, yet Berry failed to adapt to the changes despite advance knowledge.  Specifically, CW6 observed that in 2019 and 2020, Berry was unable to steam several wells in the Pliocene formation in Kern County, California because the Company failed to obtain timely UIC Permits.  CW6 estimated that there were potentially hundreds of proved locations in the Pliocene formation, and Berry drilled some of these wells, but their long-term potential was uneconomic because the Company could not utilize steam to increase production without UIC Permits. CW6 believes that these wells were written down by Berry's auditors due to failure to secure the UIC Permits. CW6 believes that Berry never submitted a UIC Permit packet for these wells to CalGEM for approval. Similarly, CW6 also recalled conversations in budgeting meetings about how wells in the North Midway-Sunset asset were drilled as conventional oil and gas wells because Berry did not timely obtain UIC Permits. Even as of September 2021, CW6 stated that Berry was still waiting for UIC Permits to be approved in the North Midway-Sunset field.  CW6 confirmed that one of the main causes of the failure to secure timely permits was that the quality of data in Berry's packages was

poor, and Berry submitted applications without the complete, required information.

77.     According to the Securities Action, CW6 also recalled that in early 2020, Berry pushed to drill more marginal wells because it was limited in its ability to drill better wells due to a lack of permits. CW6 confirmed that this strategy was already planned months before it was deployed in the Spring of 2020 -- long before a significant slowdown in production in 2020 due to market conditions was announced.

78.     In the Securities Action, CW7 is described as a contractor-consultant at Cornerstone, who was retained as a third-party consultant by Berry from December 2017 to May 2021 to assist in streamlining the permitting process. According to the account of CW7, chronic internal deficiencies which prevented the Company from securing timely permits already existed in December 2017. According to CW7, the Securities Action defendants' own failure to secure timely permits before California issued the November 2019 moratorium on new permits associated with fracking and high-pressure cyclic steaming diminished the Company's inventory.

79.     It is alleged that between January 2019 and May 2020, CW7 assisted with the permit packages for 863 wells. According to CW7, a majority of these wells required steam injection and Berry had failed to timely secure the needed UIC Permits to steam them.

80.     According to the account of CW7, in March 2019 production in the Southwestern property slowed down because Berry could not secure abandonment permits to safely drill new wells. CW7 states that this issue was caused by Berry's failure to provide adequate data to the predecessor of CalGEM. CW7 further states that, in the Southwestern project, Berry intended to drill 48 thermal diatomite wells on November 7, 2019, but the Company did not have permits to use high pressure cyclic steam in these wells to generate production. Berry failed to submit applications for these wells before the moratorium for new high pressure cyclic steam permits took

effect on November 19, 2019.

81.     CW7 confirmed that the defendants to the Securities Action took an unusually long time to properly submit adequate paperwork in order to secure wells between October 2019 and December 2019, including at the Company's Hill property in the Tulare formation, and that slow permitting submissions repeatedly hampered the Company's ability to secure timely permits.

82.     The account of CW7 in the Securities Action also included specific examples of how Berry's production targets were negatively impacted by the failure to secure timely permits in early 2020, months before the Securities Action defendants revised targets and blamed "current market conditions" for the revision. For example, according to CW7, Berry submitted batches of conventional oil and gas permits to Kern County, California for drilling in the Olig Potter formation on January 6, January 7, January 13, March 1, March 2, and March 3, 2020.  CW7 observed that Berry sought conventional oil and gas permits in this area, but the Securities Action defendants knew it was unprofitable to drill the wells without utilizing steam. CW7 stated that faulty data was presented in applications for permits related to these wells. In fact, between December 2019 and early 2020, CW7 estimates that the Securities Action defendants sought Drilling Permits for approximately 540 wells that Berry did not even intend to drill because of a lack of UIC Permits, the lack of which prevented the steaming necessary to efficiently produce oil.

83.     The account of CW7 further confirmed that, with respect to the Pliocene formation in the South Midway-Sunset, production was negatively impacted by the failure to obtain UIC Permits. According to CW7, Berry's failure to secure UIC Permits for these wells in the Pliocene formation was entirely due to the Securities Action defendants' own actions and not caused by any alleged regulatory change.

84.     In the Securities Action, CW7 described other ways in which production yields

31

suffered in early 2020 because of poor planning for permits. Specifically, CW7 described the 21-Z project in the Tulare formation in February 2020 where Berry changed drilling plans midstream, slowing down the permitting submission process. Because the 21-Z project involved over 100 wells, and was near a school and small neighborhood, CW7 states that the permitting process was more strenuous and involved more intense interactions with regulators. While Berry submitted an application for the permit to the appropriate County in February 2020, according to CW7, the numerous modifications and poor coordination among Berry employees led the Company to submit an application for a permit that did not match the locations of the actual drilling sites. Specifically, CW7 explains that the locations of the drilling sites were not physically verified before Berry submitted the permits, and Berry employees merely used Google Earth to identify the drilling locations. CW7 recalled that it then took two full months to merely draft up plans for these wells.

85.    The account of CW7 also confirmed that Berry's permits in the Fairfield wells in the Potter formation in North Midway-Sunset were not suitable because the permits did not match the variances required for drilling. According to CW7, asset managers and operations managers, as well as the geologists, all knew the permits were not going to be suitable, but Berry simply wanted to say that it had permits, whether they were suitable or not.

### D.    The IPO and the Individual Defendants' Material Misstatements and Omissions in the Registration Statement

86.    In the IPO on July 26, 2018, Berry sold 10,497,849 shares of BRY common stock pursuant to the Registration Statement at a price of $14 per share. The Individual Defendants caused the Registration Statement to contain untrue statements of material fact and omit other facts necessary to make the statements not misleading under the circumstances in which they were made. The Registration Statement was signed by defendants Smith, Baetz, Voiland, Buckley, and

Vazales.

87.     The Registration Statement couched numerous risks to the Company's core operations as merely possible or remote even though the risks had already materialized or already had a high risk of occurring in the near term. With respect to regulatory and permitting risks and the Company's inability to drill wells at the time scheduled, the Registration Statement stated:

> Investing in our common stock involves risks that include the speculative nature of oil and natural gas exploration, competition, volatile commodity prices and other material factors. You could lose all or part of your investment. You should bear in mind, in reviewing this prospectus, that past experience is no guarantee of future performance. You should read carefully the section of this prospectus entitled "Risk Factors" beginning on page 34 for an explanation of these risks before investing in our common stock and "Cautionary Note Regarding Forward-Looking Statements" on page 56 of this prospectus. ***In particular, the following considerations may offset our competitive strengths or have a negative effect on our strategy or operating activities:***
>
> *****
>
> Our business requires substantial capital investments. We may be unable to fund these investments through operating cash flow or obtain any needed additional capital on satisfactory terms or at all, which could lead to a decline in our oil and natural gas reserves or production. ***Our capital investment program is also susceptible to risks, including regulatory and permitting risks, that could materially affect its implementation.***
>
> *****
>
> ***We may not drill our identified sites at the times we scheduled or at all.***

 (Emphasis Added).

88.     The statements identified above from the Registration Statement were materially false and misleading when made because they omitted the following material information necessary to make them not misleading under the circumstances in which they were made: (a) significant regulatory and permitting risks had already had a material impact on the Company's competitive strengths, strategy, and operating activities, (b) the chronic internal deficiencies at the Company that caused a serious failure to obtain timely permits, including UIC Permits, had already

emerged several months before the Company went public, and thus (c) a significant risk that the Company would not drill at identified sites at the times scheduled had already materialized or had a high risk of occurring.

89.    The Registration Statement further represented the following with respect to permitting delays or delays specifically associated with water disposal constraints, steam injection and well stimulation:

> ***Drilling for and producing oil and natural gas are high risk activities with many uncertainties that could adversely affect our business, financial condition or results of operations***.
>
> Our future financial condition and results of operations will depend on the success of our development, production and acquisition activities, which are subject to numerous risks beyond our control, including the risk that drilling will not result in commercially viable or economically desirable oil and natural gas production or may result in a downward revision of our estimated proved reserves due to:
>
> •    poor production response;
>
> •    ineffective application of recovery techniques;
>
> •    increased costs of drilling, completing, stimulating, equipping, operating, maintaining and abandoning wells; and
>
> •    ***delays*** or cost overruns caused by equipment failures, accidents, environmental hazards, adverse weather conditions, ***permitting or construction delays***, title disputes, surface access disputes and other matters.
>
> \*\*\*\*\*
>
> Further, many additional factors ***may curtail, delay or cancel our scheduled*** drilling projects and ongoing operations, including the following:
>
> •    ***delays imposed by, or resulting from, compliance with regulatory requirements, including limitations on water disposal, emission of greenhouse gases ("GHGs"), steam injection and well stimulation***;
>
> •    pressure or irregularities in geological formations;
>
> •    ***shortages of or delays in obtaining equipment and qualified personnel or in obtaining water for steam used in production or pressure maintenance***;
>
> •    lack of available gathering facilities or delays in construction of gathering facilities;

- lack of available capacity on interconnecting transmission pipelines; and
- other market limitations in our industry.

*Any of these risks can cause substantial losses*, including personal injury or loss of life, damage to property, reserves and equipment, pollution, environmental contamination and regulatory penalties.

(Emphasis added).

90.     The above statements were materially false and misleading when made because they omitted to disclose that the failure to timely obtain UIC Permits had already significantly increased the risk that: (a) drilling projects would be curtailed or delayed or cancelled, (b) water disposal and steam injection requirements would be limited, (c) obtaining water for steam used in production would either be delayed, curtailed or cancelled, and (d) the high risk that (a)-(c) would occur would cause substantial losses.

91.     The misleading nature of the purported disclosures from the Registration Statement set forth above is confirmed by, at least, the following facts alleged in the Securities Action: (a) CW4, CW5 and CW7 confirmed that the Company had already failed to secure timely permits several months before the IPO, (b) a SWOT analysis prepared and presented by CW5 to the highest levels of management at the Company before the IPO concluded that the failure to secure timely permits was already a threat to the Company's business, and (c) CW4, CW5 and CW7 confirmed that this "threat" was caused by, among other things, the Securities Action defendants' submission of faulty data to regulators and failure to build sufficient lead time to ensure timely receipt of permits.

92.     Defendants Smith, Baetz, Voiland, Buckley, and Vazales used the materially false and misleading Registration Statement to raise approximately *$110 million* in net proceeds from investors in connection with the IPO, after deducting underwriting discounts and offering expenses payable by the Company.

**E.    The Individual Defendants Fail to Disclose Known Trends and Uncertainties and Significant Risk Factors, In Violation of Items 303 and 503 of SEC Regulation S-K**

93.    SEC Regulation S-K required the Registration Statement, as well as all SEC filings and investor communications during the Relevant Period, to describe "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material impact... on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii) ("Item 303") (2017).  "Disclosure is mandatory where there is a known trend or uncertainty that is reasonably likely to have a material effect on the registrant's financial condition or results of operations."  SEC Release Nos. 33-8056; 34-45321; FR-61.

94.    The SEC has emphasized that the disclosure requirements under Item 303 are "intended to give the investor an opportunity to look at the company through the eyes of management by providing both a short and long-term analysis of the business of the company" and "a historical and prospective analysis of the registrant's financial condition . . . with particular emphasis on the registrant's prospects for the future."  SEC Release No. 6835, 1989 WL 1092885, at *3, *17.  Thus, "material forward-looking information regarding known material trends and uncertainties is required to be disclosed as part of the required discussion of those matters and the analysis of their effects."  *See* Comm'n Guidance Regarding Mgmt.'s Discussion and Analysis of Fin. Condition and Results of Operations, SEC Release No. 8350, 2003 WL 22996757, at *11 (December 19, 2003).

95.    Item 503 (now codified as Item 105) required the Individual Defendants to include in the Registration Statement a "discussion of the most significant factors that make the offering speculative or risky." 17 C.F.R. § 229.503(c) (2011).  Item 503's purpose is "to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities."  Sec. Offering Reform, SEC Release No. 8501, 2004 WL 2610458, at *86 (Nov. 3, 2004). The

discussion of risk factors must be specific to the particular company and its operations and must explain how the risk affects the company and/or the securities being offered.  Generic or boilerplate attempts to disclose potential risks and shield oneself from liability do not tell investors how the specific risks could affect their investment. *See* Statement of the Comm'n Regarding Disclosure of Year 2000 Issues and Consequences by Pub. Cos., Inv. Advisers, Inv. Cos., & Mun. Sec. Issuers, 1998 WL 425894, at *14 (July 29, 1998).

96.    Put simply, Item 503 required the Individual Defendants to disclose the most significant risks that could adversely affect Berry's present or future business expectations and prohibited the Individual Defendants from relying on generic risks that could apply to virtually any other energy company in the industry.

97.    Throughout the Relevant Period, the Individual Defendants omitted in the Registration Statement and other communications with stockholders that Berry had failed to obtain timely permits because of systemic internal deficiencies at the Company, as opposed to any regulatory changes that were out of the Individual Defendants' control, and that this failure severely limited the ability to inject steam into wells and created water disposal constraints, both of which negatively impacted production rates. Moreover, the Individual Defendants failed to disclose that the lack of proper and timely permits was a direct result of, among other things, their: (a) failure to build sufficient lead time to secure permits such as UIC Permits, which took several years to obtain, (b) repeated submission of faulty data in application packages that were ultimately denied, (c) decision to flout regulations that required producers to obtain UIC Permits for cyclic steam wells, and (d) failure to correctly match the location of the wells to the actual area for which the wells were permitted. Nor did the Individual Defendants ever disclose that this severe problem caused the Company to engage in desperate measures in 2020, such as drilling wells that could not

be steamed, illegally injecting hot water into wells, and attempting to remedy old wells, all in an effort to artificially increase production. These trends and uncertainties had already begun to emerge long before the IPO. Yet the Individual Defendants have omitted disclosure of their existence to this day, even though numerous CWs in the sustained Securities Action confirmed that the problems persist.  Item 303 affirmatively required the Individual Defendants to disclose the severe delays in receiving permits and the resulting negative impact on production.

98.     The Individual Defendants also violated their affirmative disclosure duties imposed by Item 503 (now Item 105). Berry's permitting problems, which in the Securities Action CW4, CW5 and CW7 confirmed emerged before the IPO, at the very least, could adversely affect Berry's present or future business expectations, and, in fact, had a negative impact on those expectations, yet the Individual Defendants failed to disclose these risks.

### F.    The Individual Defendants' Post-IPO False and Misleading Statements From August 2018 Through August 2020

99.     On August 23, 2018, the Individual Defendants participated in a conference call with stockholders and analysts to announce the Company's financial results for the second quarter of 2018.  During that call, defendant Smith made the following materially false and misleading statements regarding the Company's "advanced planning" for and alleged mitigation strategy for permits:

> Operationally, we are very good at and intend to improve our core strengths, including our ability to thermally stimulate reservoirs, for example. And I should mention here that we have a Berry-first proactive approach to permitting and working with our regulatory partners in California, Utah, Colorado and Texas. ***By planning for activity well in advance, taking the lead on regulatory efforts impacting or potentially impacting Berry and building exceptional relationships with our regulators, we work to mitigate the risks associated with permitting our activities***.

(Emphasis added).

100.     The statements identified in the preceding paragraph were materially false and

misleading when made because, as numerous CWs in the Securities Action have confirmed: (a) Berry had already failed to plan wells "in advance" to secure permits such as UIC Permits; (b) the lack of UIC Permits in particular severely limited the Company's ability to inject steam and expand water disposal requirements; and (c) as a result, the Company had already failed to "mitigate the risks associated with permitting our activities" before Smith made these false statements.

101.    On November 8, 2018, the Individual Defendants held a conference call with stockholders and analysts to announce the Company's financial results for the third quarter of 2018, in which defendant Smith made the following materially false and misleading statements, claiming "ever-growing efficiency and speed in [Berry's] permitting process everyday":

> Let me explain. We are on target to meet our production goals for the year. The third quarter results show a significant increase in production, particularly in September. Despite delayed receipt of some completion permits from the California Division of Oil and Gas, otherwise known as DOGGR, the regulatory agency in California responsible for approving permits, these permits were for our Hill lease wells in the Belridge field. We are receiving those permits now and have worked extensively with DOGGR as we develop a strong working relationship recognizing the needs of both Berry and DOGGR. The permitting issues slowed our 2018 development plan by shifting approximately 40 completions to the first quarter of 2019. Gary will go into more detail in his comments. *The process is now working well and because of our Berry first approach, we are seeing an ever-growing efficiency and speed in our permitting process everyday*. Prior to our going public, we made the decision to keep our three-rig program in California going through the remainder of 2018. Not only do we have the cash, but we also have an extensive bullpen of high-quality opportunities. *Our teams were able to draw from our bullpen; bring projects forward, including permitting them; and add them to our development program ready to be executed. In other words, we acted prudently and we're focused on value. This is the leadership behavior that the organization now embraces. And given the abundance of opportunities in our assets, we will be able to continue to do this well into the future*.

(Emphasis added).

102.    The statements identified in the preceding paragraph were materially false and misleading when made because: (a) the process for obtaining permits was not "working well" at all, even before the Company went public as confirmed by the Securities Action accounts of CW4,

CW5, and CW7; (b) as confirmed by the accounts of all seven CWs in the Securities Action, the systemic failure to obtain permits was, in fact, caused by a lack of "efficiency," "speed," the complete failure to "bring projects forward, including permitting them" and a general lack of "prudence" at the highest levels of management; and (c) as a result, the Company was not in a "position to continue to do this well into the future."

103.    During the November 8, 2018 earnings conference call, an analyst specifically asked about permits and the regulatory landscape in California, and defendants Baetz and Grove made the following materially false and misleading statements in response:

**Q - Jacob Roberts**

In terms of the delayed procurement in the aquifer exemption and as California transitions to Governor Newsom, I was hoping to hear your guys' thoughts on the regulatory landscape going forward.

*****

**A - Defendant Baetz**

Yeah. And this is Cary, and I'll jump in with at least one last thing, the permitting side of things. Trem did a good job and Gary did a good job. It was really a process. We have been doing a lot since the company emerged in March of 2017. ***The one thing that we probably are working on better and developing relationship is with DOGGR, understanding exactly what they need, how their process works and getting in front of them. For that reason, we don't think permitting we'll be talking about permitting issues going forward as we continue to develop that relationship and work with them as a part of the team***.

**A - Defendant Grove**

And I guess I'll comment -- I'm sorry, I just can't resist. ***It truly is, and we've mentioned this before, it truly is a planning process. And so for us, we just continue to refine and define that thought process and what the timing is to allow us to meet the goals that we have set forward as an enterprise and as a company. So with that, we'll have those challenges, and we'll look for the ways to go through them and get back to exactly where we want to be. And I think we're doing that as well***.

(Emphasis added).

104.    The statements identified the preceding paragraph were materially false and

misleading when made because, as several CWs in the Securities Action have confirmed: (a) the Company failed to provide "what [CalGEM] needed" and thus permit packages were rejected due to faulty data, (b) the Company's failure to build sufficient lead time was one of the principal reasons why it could not obtain timely UIC Permits, and as a result (c) the Company's planning process for seeking permits was not "doing [] well" at the time these statements were made.

105.    On March 7, 2019, the Individual Defendants conducted a conference call with stockholders and analysts to announce the Company's financial results for the fourth quarter of 2018. During this conference call, defendant Grove was again specifically asked pointed questions about permitting delays, and defendant Grove made the following materially false and misleading statements in response:

**Q. – Leo Mariani**

Okay. That's helpful. ***And I guess just with respect to the regulatory side, I guess you guys did mention that you may had a couple of delays. That sounds like that more effective to diatomite side of the business***. You also talked about having two months of permits in hand per rig wanting to sort of increase that. Clearly, there's a new Governor in place over there in California. ***Can you maybe just give us a little bit more color around the regulatory landscape? Is there a pathway to kind of build the months of permits there? Were there kind of any slowdown as a result of any transitions in government or kind of things getting better? What can you kind of tell us about the regulations?***

**A - Defendant Grove**

Sure. Sure, Leo. This [is] Gary again, and I'll let Trem follow up, if there's – at a higher level, if needed. So just specifically back on permits again, the drilling permits have not been interrupted. There's the change of government has not done anything there. We're two months in advance of each of our rigs, which is typically where we like to be, if not more. And quite frankly, we're looking to even gaining some inventory there as well.

So, on that side, again, there's no issue. ***The only tiny issue we had specifically was in and around some of the stimulation permits that we need for the diatomite, as you correctly mentioned. We're working with the agencies there to understand the timeframe necessary, and that's truly what the question comes down to, so that we can plan accordingly. And I think we've mentioned before, once we***

41

> *understand that and feel comfortable with it, we'll be able to plan a little bit stronger in and around that particular development. Obviously, we like that area, and we'll continue to go down that path, and ultimately get it to where we feel like we can forecast it within the range of everything else that we have in our inventory.*

(Emphasis added).

106.    The statements identified in the preceding paragraph were materially false and misleading when made because: (a) permitting delays were not limited to a so-called "tiny issue" "in and around" WST Permits needed for fracking, but severely limited the Company's ability to obtain UIC Permits before this false statement was made; and (b) defendant Grove failed to disclose pervasive permitting delays that have been confirmed by numerous CWs in the Securities Action, and which seriously curtailed the Company's ability to inject steam or dispose of water and thus harmed production rates.

107.    On May 16, 2019, the Individual Defendants hosted the Company's "Investor Day" with analysts and stockholders, and extensively discussed various issues that impacted the Company's business.  In particular, defendant Smith introduced Ms. Silva, Berry's new Vice President of Government, Regulatory and Environmental Affairs hired in April 2019.  Ms. Silva was ultimately promoted to the position of EVP of Corporate Affairs in February 2020 and was identified on Berry's website as one of the core members of upper management.  At the Company's May 16, 2019 Investor Day, defendant Smith told stockholders that Ms. Silva was hired to streamline and optimize the permitting process at Berry, and Ms. Silva spoke at length about the regulatory landscape, the process for receiving permits, and the amount of time required to receive each permit. After Ms. Silva gave her introductory remarks, defendant Grove then spoke at length about the permitting process, and made the following materially false and misleading statements:

> We're always going to drilling in packages of some multiple of four for the most part and three of those will be a producer and one of them [ph]. Alright. Now for the fund slide, ready. *You heard Megan say that we don't have a permitting*

*problem.*

*Let me just add to that we don't have a permitting problem*. But we have is a desire to understand the process everywhere and so that we can plan accordingly and get a very consistent timeframe for each of the permits that are required for us. *And we've been able to do that for the first three of these I'm going to talk about with no problem. The one that we've struggled with recently has been WST and I'll talk about that in a second*.

But, let's just talk about what's required to do our work out here in California. So we need an underground injection control permit that allows us to inject fluids and allows us to inject steam, allows us to inject water. we need that permit. You get it, it covers a certain area, you're done for that certain area, that's it.

*You don't have to apply every single well, it's a one-time deal for that particular area taking care of. So do we need have for all of these Thermal Diatomite, injectors and Sandstones, producers and Sandstones and the Non-Thermal Diatomite yes, we do. Do we have it in all of those? Yes, they are and all the development areas. Are there some more that we're going to need? Yes, there are as we expand but they're proceeding as expected*.

*We put those permits in. We have a very good idea of what the timeframe that's going to take typically 6 months to 12 months plus or minus, but we plan on 12:1[ph] the longest one. We don't plan on the shortest one. So we very comfortable with that cycle*.

The second one is a drilling permit, very straightforward, we need a drilling permit to go drill a well. If it's on BLM acreage, we need to get a permit from the BLM if it's on county acreage, we need to get permit from the county. And then from Berry it goes to the division of oil and gas. Those permits have its BLM is probably 60 days, if it's county it's 30 days to 45 days, we know that, that happens, we're doing that now, no problems there.

Happens in every single one of them on going as expected. The next one is aquifer exemption permit, hey, you heard Megan talked about. Do we need it in every place yes, we do. Does it -- do we have things that are already inside that earlier boundary? Yes, are those impacted No.

It's only for the things that we want to do that are outside of the initial boundaries that were set up for each field that's what we need in aquifer exemption permit for. Have we got those already for McKittrick and Poso, yes, we've done, yes we have. So we're waiting on the one in Midway Sunset where again it's in progress and as expected. And Megan talked a little bit about the whole timeline and how that works, but we're right in line with that have we make plans on that being for 2019, how we made plans to get that in like I said early third quarter, yes, we have.

So our Thermal Diatomite is predicated on that in the latter half of the year. Think you heard on the last call, you heard me say and you've heard Cary said before about the latter half of the year being more heavy on production. It's because a lot of our Thermal Diatomite is coming online in the latter half of the year. Okay.

And so lastly, let's talk about Well Stimulation permit WST So that's required for us to go out and hydraulically stimulate in Belridge. Okay. It's now required for Thermal Diatomite Well, it's not required for an injector and Sandstone is not required for producer and Sandstones. It is required to go out in Belridge and hydraulically stimulate Diatomite Well -- Non-Thermal Diatomite Well.

So what are we doing with that? *Well, we're working with the agencies to obtain consistent planning timing, so Megan talked about that. That's one of the goals that she has for us and it will help us in terms of our process. I've said many times, It's a planning process out here, what we do overall it's not that complicated from that standpoint. It's just getting things in the right place and starting at the right time to meet your business plan expectations in that given period.*

And so the thing that I've had to sit and talk about on a couple calls, but I don't want to do anymore is to say that we expected to get a WST permit in a certain time frame and it did not happen. So therefore, we're not -- we don't have these Wells on production at the time. We thought we would, okay. So with that being said when we came out and gave you a when prices dropped and we decided to pull capital back just like we talked about that's what we do if prices go up.

(Emphasis added).

108.    Later during that same Investor Day on May 16, 2019, defendant Smith again spoke with stockholders, and doubled down on defendant Grove's material misrepresentations, stating the following:

Okay, and Berry first is driven by that we've made big moves there, bringing Megan in is a monster move. And in fact our Berry I think at the credibility of Berry went up in Sacramento because Megan had been working for one company.

She left they were all very concerned, oh my gosh, she's getting out of the business, but then went to work for Berry. There must be something to Berry, okay. And that's gives me a lot of faith in what we're trying to do as well. *So we do not have a permitting problem, as Gary said five times at least I'll say it another 20 times.*

*We do not have a permitting problem. It's a planning issue, we plan for it, we made one -- had one glitch here with the WST's. We look forward to getting that on a regular basis, so we can incorporate it in our plans like we do. The UIC the drilling permits and everything else we deal with.*

44

Okay. That is what you do. And that's what we get paid for. We manage that the relationship between the regulators and the pot and the and the politicians.

(Emphasis added).

109.    The statements identified above during Berry's May 16, 2019 Investor Day were materially false and misleading when made because, as the detailed and particularized accounts of all seven CWs in the Securities Action have confirmed: (a) the Company already had a severe "permitting problem," (b) the severe "permitting problem" was not limited to WST Permits but extended to UIC Permits; (c) the Company's process for obtaining UIC Permits was not "proceeding as expected," (d) the lead time for obtaining UIC Permits was not "6 months to 12 months," but well over a year as confirmed by CW1, CW2 and CW3; (e) all seven CWs in the Securities Action confirm that at no time during the Class Period did the defendants to the Securities Action "plan on the longest" cycle to build lead time for permits, and (f) the Company was not "working with the agencies to obtain consistent planning timing," but faced rejection at the hands of CalGEM for submitting faulty applications.

110.    On November 7, 2019, the Individual Defendants conducted a conference call with stockholders and analysts to announce the Company's financial results for the third quarter of 2019.  During this conference call, defendant Grove was again asked pointed questions by an analyst regarding the regulatory landscape and permitting delays, and defendant Grove made the following materially false and misleading statements in response:

**Q - Leo Mariani**

Okay, that's helpful. And I guess, perhaps you could talk a little bit more about the regulatory environment in California. It seems like the new Head of DOGGR has been a little bit more aggressive than the previous head. And I know he is levered some fines on some companies, and I guess there were some trading over some frac permits that were issued as well. How do you think about what the administration from DOGGR's perspective feels about fracking out there these days in California? And how do you think the new head kind of feels about some of the proposed set-

backs that were talked about this past spring?

*****

**A - Defendant Grove**

*I'll just reiterate a couple of things that Trem has mentioned. So as far as permits for fracking or hydraulic stimulation, they're called WSTs. That has been a little bit delayed, as you mentioned. However, for us that has no impact on us for this year or into the part of 2020, (inaudible) is that we don't -- do not have any outstanding request in for WST permitting at this time.* But it is a direct result of them, putting someone in that share, which has been done. And I would just add the fact that we're in communication with them, our teams led by our Corporate Affairs Group is -- and Trem has been very active in making sure that we are in participation with regulations going forward. So it's probably easiest thing to say. *But right now for us, we don't see any impact there. And lastly, as Trem mentioned, our other permitting is not associated with this. It just permits to drill. And those are moving forward, as you might expect*.

(Emphasis added).

111.     The statements identified in the preceding paragraph were materially false and misleading when made because: (a) defendant Grove again falsely described the permitting delays as limited to WST Permits for fracking but omitted to disclose the systemic failure to secure UIC Permits; (b) the failure to obtain UIC Permits negatively impacted production because the Company was unable to inject steam or dispose of water to increase production yields; and (c) the UIC Permits were also the "other permitting" associated with serious delays.

112.     The falsity of defendant Grove's statements is confirmed by, at least, the following facts: (a) in Berry's 2019 10-K, filed with the SEC in February 2020 (and signed by a majority of the Company's current Board members), the Individual Defendants admitted that Berry had in fact suffered permitting delays for UIC Permits in late 2019 although the Individual Defendants falsely blamed the delay on regulatory changes, (b) according to the account of CW1 in the Securities Action, the Company ceased production on two rigs in the Fall of 2019 because it lacked the necessary permits, (c) according to the account of CW2 in the Securities Action, the Company

embarked on an illegal scheme to inject hot water into wells in late 2019 to dampen the impact of reduced production from a lack of necessary permits, (d) the account in the Securities Action of CW3 confirmed that the failure to obtain UIC Permits became a drastic problem before June 2019, (e) the account in the Securities Action of CW6 confirmed that in 2019, Berry was unable to steam wells in areas such as the Pliocene formation because the Company failed to obtain UIC Permits, and (f) the account in the Securities Action of CW7 identified numerous occasions where the Company failed to obtain the necessary permits before this false statement was made.

113.    On February 27, 2020, the Individual Defendants held a conference call with stockholders and analysts to announce the Company's financial results for the fourth quarter of 2019.  During this conference call, an analyst asked defendants Smith, Baetz, and Grove specific questions about how the Company was progressing towards receiving timely permits. Defendants Smith and Grove made the following materially false and misleading statements in response:

**Q - Leo Mariani**

Okay. That's helpful. And I guess just from a regulatory perspective apart from Tuesday's legal ruling there and Kern County wanted to just get a sense of how generally the regulatory environment in the state has been progressing. I think you guys have started to kind of get just more regular sandstone permits kind of starting in January. *I wanted to see how that was going thus far in February? And just any updated thoughts you guys have on the current moratorium on cyclic steam permits and WST permits? And how long that could last year in 2020?*

**A - Defendant Smith**

Leo, this is Trem. I'll start with the answer to that. First off as you know in 2019 we spent a fair amount of money and we're very focused on building our what we call our corporate affairs group. And Megan Silva runs that group and has given us the platform to build and the network and relationships in Sacramento and launched Livermore and the county in particular that keeps us as aware as any company of what's going on and how to respond.

We've also done through our Berry First. I can't say it enough our Berry First approach in terms of building our credibility as a true partner with California. We do what we say we're going to do. So just so you know the foundation for the

conversation that you're talking about is well established. That said we believe that we are participate we know we are participating in the discussions around the moratorium. Our processes are communicated and well are beginning to be well understood.

So I fully anticipate that study to progress. I cannot project exactly when that moratorium will be lifted but I am confident it is truly the intent of the state to lift that with the goal of being safe for the communities and also the environment. And so I'm pretty confident in that today.

***And as far as our sandstones go, those permits as you pointed out R&D coming through. So Cogen in the state have lived up to the words that they said and I'm truly appreciative for that. So thank goodness Gary and his teams have a huge inventory of opportunity that allows us to adapt and I think we've demonstrated that well over the last couple of years***. Gary has a few comments to add to that.

### A - Defendant Grove

Yes Leo. So just a couple of other things. ***So just to recognize that our plan for this year we do not have any thermal diatomite wells in our plan. And we also don't have anything that requires a WST. So we don't have anything that we're requiring hydraulic fracturing during the year as well. So as Trem mentioned we are looking at sandstone development for this particular calendar year. Now that being said if and when the moratorium is lifted that might change some plans for us and we're nimble enough to be able to make those changes as we move forward and we're continuing to be ready for that opportunity when it arrives***.

### A - Defendant Smith

***And in fact we've built a bull pen [ph] of thermal diatomite wells to be permitted for when that occurs Leo***.

(Emphasis added).

114.    The Individual Defendants' February 27, 2020 statements identified in the preceding paragraph were materially false and misleading for the same reasons that the Individual Defendants' statements identified herein on March 7, 2019, May 16, 2019, and November 7, 2019 were materially false and misleading, as set forth above.

115.    On May 8, 2020, the Individual Defendants conducted a conference call with stockholders and analysts to announce the Company's financial results for the first quarter of 2020. During this conference call, defendant Grove made the following materially false and misleading

statements concerning Berry's purported "intense permitting program" and the number of permits

that the Company had already secured to date:

> ***Additionally, we proactively began an intense permitting program in the quarter to be ready once we decide to begin our next drilling program. As of today, we have more than 100 wells permitted and another 200 plus moving through the California regulatory system***. Currently, we plan to focus the remainder of the capital in the latter half of this year, subject to market conditions. Our calculated capital efficiency for the first half of 2020 will be better than in the past. However, looking forward, we anticipate that our capital efficiencies will return to more historical levels.

(Emphasis added.)

116.    The May 8, 2020 statements identified in the preceding paragraph were materially

false and misleading when made for the same reasons that the Individual Defendants' May 16,

2019 statements identified herein were materially false and misleading, as set forth above.  In

addition, the May 8, 2020 statements identified in the preceding paragraph were materially false

and misleading when made because: (a) in the Securities Action, CW7 has confirmed that between

January 2019 and May 2020, CW7 assisted with the application packages for 863 wells and the

Company failed to obtain UIC Permits for the vast majority of these wells; (b) the account of CW2

in the Securities Action confirmed that, on or about when the above May 8, 2020 statements were

made, Berry was unable to drill wells in the Pliocene area because it failed to obtain UIC Permits;

(c) according to the accounts of CW2 and CW6 in the Securities Action, at this time, Berry engaged

in desperate strategies to blunt the impact of a lack of UIC Permits by illegally injecting hot water

into wells and drilling marginal wells; and (d) both CW1 and CW4 confirmed in the Securities

Action that the number of permits on hand that defendant Grove touted was false and misleading,

because these purported permits were either obtained for the wrong location or because the wells

could not be steamed to increase production due to a lack of UIC Permits.

117.    In addition, during the May 8, 2020 investor conference call, defendant Smith

made the following similar misrepresentations:

> First, our current plan for this year is to pick up a rig late in the third quarter, contingent on oil price improvements. ***We heavily weighted our CapEx spend to the first quarter when we increased permitting efforts in the last couple of months. And as Gary mentioned, we have over 100 permits in hand and another 200-plus permits moving through the California regulatory system as we speak. In other words, the permitting process works through the downturn and we will have plenty of wells to drill.*** You may also recall that Governor Newsom put all new high-pressure cyclic-steam projects in moratorium late last year while a joint CalGEM-Lawrence Livermore Lab study on safe operations with high pressure cyclic-steam was conducted.

(Emphasis added).

118.     Defendant Smith's May 8, 2020 statements identified in the preceding paragraph were materially false and misleading for the same reasons that defendant Grove's May 8, 2020 statements identified herein were materially false and misleading, as set forth above.

119.     On August 5, 2020, the Individual Defendants conducted a conference call with stockholders and analysts to announce the Company's financial results for the second quarter of 2020.  During this conference call, defendant Grove again made the following materially false and misleading statements concerning Berry's permitting process and the number of permits that the Company had purportedly secured to date:

> ***We have continued with our permitting process on all other projects. And as of today, we have roughly 185 drilling permits in hand, all for sandstone wells, as we finish the 2020 permitting program and begin our 2021 program.***
>
> ***We also have approximately an additional 190 permits, either at CalGEM or waiting to send to CalGEM.***

(Emphasis added).

120.     Defendant Grove's August 5, 2020 statements identified in the preceding paragraph were materially false and misleading when made for the same reasons the May 8, 2020 statements identified herein were materially false and misleading when made, as set forth above.

121.     During the August 5, 2020 earnings conference call, defendant Baetz also made

the following materially false and misleading statements regarding the number of permits the Company supposedly then had on hand, and the alleged ability to be "flexible" and "scale up quicker if the market allows" as a result:

### Q - Charles Meade

Yes, thank you for that added clarification. And Trem, maybe for -- this might be best for you, but of course, you can kick it anywhere. The -- I'm curious, I'd like -- Leo's question, zeroing in on this 748 acres for $5 million, and I appreciate the color you've already added to it. I wondered if you could give us your thoughts. Is this representative of the sort of opportunity that you see emerging through the back half of '20 into '21? Or is this just kind of a small bite, and we should expect bigger bites further down the line?

*****

### A - Defendant Baetz

Charles, this is Cary. I'm -- just because I have to talk too, just when the other two talked.

So I feel left out. ***But also, I just want to highlight, as Trem and Gary both said, we do have a lot of permits in hand.***

***So it does give us flexibility to do what -- to be very nimble in the Fourth Quarter where we put the rig on the sandstones.***

***It also gives us the ability to scale up quicker if the market allows -- if market did something crazy and pricing became even that much better. I just want to make sure everybody understood that as well.***

(Emphasis added).

122.    Defendant Baetz's August 5, 2020 statements identified in the preceding paragraph were materially false and misleading when made for the same reasons the May 8, 2020 statements identified herein were materially false and misleading when made, as set forth above. In addition, defendant Baetz's August 5, 2020 statements were materially false and misleading when made because: (a) all seven CWs in the Securities Action confirmed that the permitting delays persisted from July 2018 through November 2020; (b) according to the account of CW2, a

51

"workover program" was initiated in November 2020 as a method to uneconomically bolster Berry's production numbers with old wells because the Company had failed to obtain timely permits, and (c) the account of CW3 in the Securities Action confirmed that the failure to secure timely permits remained a major issue at the Company even when CW3 departed the Company in September 2021.

### G.    Securities Action Accounts of CWs' Direct Interactions and Communications With Certain Individual Defendants

123.    It is alleged in the operative complaint in the Securities Action that several of the CWs regularly interacted and communicated with certain of the Individual Defendants, demonstrating their knowledge of the pervasive permitting problems at Berry.  For example, the Securities Action alleges that CW1 met on at least a monthly basis with defendants Smith and Baetz (as well as several Vice Presidents of the Company), and that CW1 took contemporaneous, written notes of discussions during these meetings, some of which were reviewed by counsel for the Securities Action plaintiffs.

124.    According to the Securities Action, one particularly damning contemporaneous note taken by CW1 during a meeting on March 4, 2020 states that Ms. Silva warned the meeting attendees, including defendants Smith (identified as "Trem") and Baetz (identified as "Cary"), that Berry's permitting process and production targets did not match the true permit flow and implementation plan.  The snapshot of CW1's contemporaneous notes which appears in the operative Securities Action complaint is below:

## Sync Mtg. 3-4-20

Jacob's Opex - Workover?
Mawsol's Performance review timeline
                Candidate interview
Kyle's CC, ~ approvals, paying KCEIR via Acht
Nick's
Corey's Adding people - G&A check
        Stay positive in tough environment, keep motivation up
Trevi's 2mmw - town hall - be there
Terry's AFE Nov. User acceptance testing (week of 3/16)
Megan's Permitting process / Production targets don't match
        the permit flow & implementation plan

125.    According to the Securities Action, CW1 has confirmed that at this meeting Ms. Silva told defendants Smith and Baetz that Berry's poor permitting flow would cause Berry to fall short of production targets. Defendants Smith and Baetz were also allegedly informed multiple other times that permitting flow did not match production targets. Per the account of CW1, who directly reported to and met with defendant Grove on a weekly basis, CW1 repeatedly emailed defendants Smith and Grove informing them about the magnitude of problems which led the Company to fail to obtain permits since at least the Summer of 2019. The Securities Action further alleges that CW1 repeatedly warned defendants Smith and Grove, on a weekly basis, that the water disposal constraints caused by a failure to obtain timely UIC Permits were then negatively impacting the Company's production targets and business prospects.

126.    According to the account of CW1, Ms. Silva, the EVP of Corporate Affairs hired to oversee and streamline the permitting process -- an addition defendant Smith touted to stockholders as a "monster move" -- also warned defendants Smith, Baetz and Grove, on a weekly basis, regarding the lack of UIC Permits and the negative consequences associated with a failure to obtain timely permits.

127.    In addition to regularly meeting with defendant Grove to discuss permitting

problems, it is alleged in the Securities Action that CW1 also exchanged text messages with defendant Grove, and that CW1 shared the contents of these text messages with counsel for the plaintiffs to the Securities Action. According to the operative complaint in the Securities Action, on October 17, 2019, CW1 and defendant Grove discussed the looming need to drill at the uneconomic Ethyl D wells because of a failure to obtain permits at more favorable locations. At 12:20 p.m. and 12:21 p.m. on that day, defendant Grove is alleged to have sent CW1 a text message stating: " . . . Basically, we might go ahead and drill some wells on Ethyl D as you heard me discuss . . . I hate that we have to be so reactive. Goal is not to be in this position." It is alleged that CW1 responded with a text message read by defendant Grove which stated: "*Yes, we plan to build a process with greater lead times and an inventory that gives us more flexibility to mitigate the regulatory inconsistencies and disruptions. Take some changes in asset level technical work and the scheduling tool and tracking will be critical to stay on course.*" (*Emphasis added*).

128.    According to the account of CW1 in the Securities Action, this text was sent on the very same day that CW1 met with defendants Smith and Baetz, and Ms. Silva. The operative complaint in the Securities Action alleges that CW1's contemporaneous notes from this meeting again show that both CW1 and Ms. Silva raised concerns about how well inventory did not align with permitting. It is further alleged that CW1 and Ms. Silva warned defendants Smith and Baetz at this meeting that Berry's failure to obtain UIC Permits caused the Company to drill at less profitable, second-tier locations. According to the account of CW1, at this meeting defendants Smith and Baetz approved the plan to drill at second-tier locations. Some of these second-tier wells included the Ethyl D wells, which were unprofitable without obtaining UIC Permits to inject steam. Defendant Grove then allegedly instructed CW1 to drill at the second-tier wells in the Ethyl D location, and CW1 and defendant Grove again discussed these issues in phone calls numerous

times in the Fall of 2019.  According to the Securities Action, CW1 has emphasized that Berry

mostly drilled at second-tier locations throughout CW1's tenure at the Company, principally due

to a failure to secure the required permits.

129.    It is alleged in the Securities Action that on December 31, 2019, CW1 again sent

defendant Grove a text message, and urged defendant Grove to increase the lead time for securing

permits. According to the operative complaint in the Securities Action, at 10:52 a.m. on that day,

CW1 texted:

> "Hi Gary, would you like to speak with me before I leave for the week? One on
> one. Joe is quiet, but he came by to tell me he understand[s] and agrees completely
> with what I am trying to communicate. ***I feel like it needs to be understood and
> directed by you and your authority, or the message will not land with the asset.
> It's quite simple really. We are not feeding the front end with enough lead time
> to ensure our ability to execute and mitigate the external regulatory barriers.***"

(Emphasis added).

130.    The Securities Action alleges that at 10:57 a.m. on December 31, 2019, defendant

Grove responded to this text message and stated that he would meet with CW1 to discuss further.

131.    CW4 also is alleged in the Securities Action to have met regularly with defendants

Smith, Baetz, and Grove to discuss how the failure to obtain timely permits had a negative impact

on production.

132.    At the end of 2019, CW4 allegedly informed defendants Smith and Grove over a

dozen times that the permits on the Formax property were faulty, and, as a result, Berry could not

drill wells at that location. In early 2020, CW4 also is alleged to have had a one-on-one meeting

with defendant Smith and told Smith CW4 needed support from senior management in various

departments to streamline the permitting process. Smith then allegedly told CW4 that he would

rely on CW4 to plan the permitting. It is further alleged that again, in early 2020, after a specific

conversation between CW4 and defendant Grove regarding Berry's failure to secure the correct

55

permits, defendant Grove told CW4 to speak with defendant Smith directly. According to the Securities Action, CW4 then informed defendant Smith that faulty information provided in the packages seeking approval for permits prevented the Company from obtaining timely permits, and CW4 also regularly emailed defendants Grove and Smith informing them that the Company could not drill wells due to a failure to obtain timely permits.

133.    The Securities Action alleges that CW1, CW4, and Ms. Silva also repeatedly warned defendant Grove that wells expected to be drilled were not feasible, because the permits did not accurately match the surface locations.  CW4 is alleged to have understood from CW4's communications with Ms. Silva that Ms. Silva informed defendants Smith and Grove about these unfeasible wells in weekly roundtable meetings.

134.    According to the Securities Action, CW4 also actually showed the information on the LLPD to defendants Smith and Grove on a regular basis at in-person meetings.  The LLPD is alleged to have provided granular data for sites that the Company intended to drill, the types of wells located in those sites and time-lined details about permit submissions. Further, it is alleged that the LLPD included cycle times for every stage of the permitting process, every date at each level of the permitting process, along with any issues that arose during the permitting process, and when the wells were actually drilled. The LLPD also allegedly contained deadlines to show when each part of the process was required to commence to meet final completion deadlines, and tracked the projects that fell behind schedule.

135.    Per the account of CW4 in the Securities Action, CW4 also routinely emailed defendant Smith a Microsoft Excel file and a Spotfire dashboard that showed high-level metrics, including the exact number of wells in the Company's inventory, how many needed permits, and the status of the permit applications.

136.    It is further alleged per the account of CW2 in the Securities Action that the Company's permitting problems were not taken seriously until March 2021. According to the account of CW2, in March 2021 defendant Smith began holding daily UIC Permit status meetings.

137.    It is alleged per the account of CW6 in the Securities Action that beginning in 2019, weekly Long Range planning meetings were held by Ms. Silva's team every Wednesday, which tracked the permits from an initial concept to actual drilling. According to CW6, defendant Grove attended one of these meetings. The account of CW6 further corroborates that at these Long Range planning meetings, the participants reviewed the granular data displayed on the LLPD, which CW6 confirmed was a large file with packages of wells ordered by timing based on the requirements of the permitting process and the Company's needs.

138.    The Securities Action alleges that CW3 attended monthly sync meetings with defendants Smith, Baetz, and Grove, and several Vice Presidents of the Company. At these meetings, it is alleged that CW3 repeatedly raised concerns about the failure to obtain timely permits. Per the account of CW3, on at least one occasion at one of these meetings, defendant Smith chastised employees for failing to secure timely permits. CW3 also is alleged to have delivered to defendant Smith's assistant an email, in which CalGEM reviewers criticized the Company for submitting faulty data in permitting applications. Per the account of CW3 in the Securities Action, CW3 is sure that Smith reviewed this email. Less than one month before CW3 left Berry, in August 2021, it is alleged that CW3 attended a meeting with defendant Smith, during which defendant Smith raised concerns about UIC Permits and stressed that the need to obtain them in a timely manner remained critical to the Company's production targets in 2022.

### H.    The Individual Defendants' February 2021 Incomplete and Materially Misleading Statements in the 2020 10-K

139.    On February 24, 2021, the Individual Defendants caused the Company to file its

2020 10-K with the SEC.  The 2020 10-K was signed by defendants Smith, Baetz, Buckley,

Mariucci, Paul, and Voiland, and contained signed certifications from defendants Smith and Baetz

pursuant to the Sarbanes-Oxley Act of 2002.  Notably, ***the 2020 10-K was signed by a majority of***

***Berry's current Board members – defendants Smith, Baetz, Mariucci, and Paul***.

140.     In the 2020 10-K, the Individual Defendants, ***including a majority of the current***

***members of the Board***, stated the following:

> Effective April 2019, CalGEM also finalized new Underground Injection Control
> ("UIC") regulations, which affects specific types of wells: (i) those that inject water
> or steam for enhanced oil recovery and (ii) those that return the briny groundwater
> that comes up from oil formations during production. The key regulations include
> stronger testing requirements designed to identify potential leaks, increased data
> requirements to ensure proposed projects are fully evaluated, continuous well
> pressure monitoring, requirements to automatically cease injection when there is a
> risk to safety or the environment, and requirements to disclose chemical additives
> for injection wells close to water supply wells. Our California development and
> production activities are subject to UIC regulations. ***With the changes in the UIC***
> ***regulations and its impact on the permitting process, we experienced delays in***
> ***obtaining the permits required to continue our planned drilling operations over***
> ***the latter half of 2019 and into 2020. Our 2020 plans were informed, ultimately,***
> ***by these permitting issues that we began to observe in late 2019 and early 2020,***
> ***and then were later modified due to the deterioration of market conditions***
> ***resulting from the COVID-19 pandemic***. Accordingly, our 2020 results were not
> significantly affected because we were able to obtain the permits necessary to
> support our planned activities.

(Emphasis added).

141.     Thus, in the 2020 10-K filed on February 24, 2021, the Individual Defendants

admitted for the first time that not only did the Company experience delays in receiving timely

permits in late 2019 and early 2020, but that these delays were initially the principal cause of a

drastic reduction in production targets in early 2020.  The Individual Defendants had never

previously admitted that the permitting problems were so severe that the Company's "2020 plans

were informed, ultimately by these permitting issues" which emerged during the "Class Period"

from July 2018 through November 3, 2020.  Instead, the Individual Defendants repeatedly made

false statements to stockholders about the permitting process, as alleged in detail above, and concealed material facts from stockholders which rendered those same statements false and misleading when made.

142.    Nevertheless, the specific information quoted above from the 2020 10-K was only a partial disclosure by the Individual Defendants, because the Individual Defendants did not disclose the true reasons for the delays in seeking permits, which were not caused by a sudden change in any regulations but emerged well over a year before the regulatory changes, and were principally caused by pre-existing internal deficiencies at the Company and the Individual Defendants' repeated failure to obtain timely permits.

143.    In addition, while the Individual Defendants attempted to exploit the COVID-19 pandemic as a reason for delay rather than truthfully addressing their own regulatory misconduct, *the account in the Securities Action of CW4 confirms that the so-called cost reduction measures that the Individual Defendants said impacted production were presented to the Board long before the first lockdown was instituted in California*, and multiple CWs in the Securities Action confirmed that pervasive production problems in 2020 were caused by the repeated failure to timely secure permits, particularly UIC Permits.

### I.    The Truth Emerged Through a Series of Partial Disclosures

144.    On April 1, 2020, after touting double digit production growth in previous quarters, the Individual Defendants caused Berry to issue a press release announcing that the Company's 2020 production target had been revised significantly downwards with growth expected to remain flat to 2% down.  The Individual Defendants also claimed that Berry would reduce capital expenditures by 50% from the midpoint of the original 2020 budget, but nevertheless bragged that the Company "[c]ontinued to file for and receive CalGEM drilling, abandonment and workover permits, increasing its available inventory."

145.     On this partial disclosure and/or the materialization of concealed risks, the Company's stock price declined by over 16.6% from its previous day closing price of $2.41 per share on March 31, 2020, to close at $2.01 per share on April 1, 2020.

146.     On August 4, 2020, the Individual Defendants caused the Company to issue a press release announcing Berry's financial results for the second quarter of 2020.  In this press release, the Individual Defendants announced that Berry's average daily production decreased by an additional 5% for the second quarter of 2020 compared to the first quarter of 2020.  The Individual Defendants acknowledged that the decline was the result of reduced drilling activity and alleged cost control measures associated with steam management that temporarily increased water disposal requirements.

147.     On this partial disclosure and/or the materialization of the concealed risks, the Company's stock price declined by over 7% from its previous day closing price of $4.90 per share on August 4, 2020, to close at $4.55 per share on August 5, 2020.

148.     On November 3, 2020, the Individual Defendants caused the Company to issue a press release to announce Berry's financial results for the third quarter of 2020. In this press release, the Individual Defendants again announced that Berry's average daily production decreased by 5% for the third quarter of 2020 compared to the second quarter of 2020. The Individual Defendants attributed the decline on reduced drilling activity and alleged cost control measures associated with steam management that temporarily increased water disposal requirements as well as plugging and abandoning idle wells.

149.     On this partial disclosure and/or the materialization of the concealed risks, the Company's stock price declined by over 5% from its previous day closing price of $2.84 per share on November 3, 2020, to close at $2.69 per share on November 4, 2020.

J.    **The Sustained Securities Action**

150.    Based on the events discussed herein, in November 2020, the Securities Action was filed in this Court, in which various claims under the federal securities laws, ***including claims for fraud***, were asserted against Berry and several of the Individual Defendants named herein: Smith, Baetz, Grove, Buckley, Vazales, and Voiland.  The Securities Action was brought on behalf of two classes of investors: (a) investors who purchased shares of Berry common stock pursuant and/or traceable to the Registration Statement issued in connection with the IPO, and/or (b) investors who purchased or acquired shares of Berry stock during the Class Period.

151.    On September 13, 2022, the defendants' motion to dismiss the Securities Action was ***denied in its entirety***, notwithstanding the materially heightened pleading standards applicable to the Securities Action pursuant to the PSLRA.  In sustaining the Securities Action, this Court concluded that the plaintiffs sufficiently alleged a series of misleading statements or omissions during the Class Period -- ***the very same disclosures which Plaintiff challenges herein*** -- as well as the "***requisite strong inference of scienter***" on the part of the defendants.

152.    Accordingly, Berry and each of the individual defendants to the Securities Action are now staring down the barrel of claims sustained against them under Sections 11 and 15 of the Securities Act and Sections 10(b) and 20(a) of the Exchange Act, as the Securities Action proceeds towards trial.

VI.    **DAMAGES TO BERRY**

153.    As alleged above, the statements and events described herein gave rise to the Securities Action being initiated against the Company in November 2020.  The Securities Action against Berry would later be sustained in its entirety in September 2022, and this Court's Order in this regard presages great damages to Berry's assets, goodwill, and reputation.

154.    Berry has suffered additional damages as well.  For example, Berry is suffering,

and will continue to suffer, from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in improper behavior and have misled the investing public, such that Berry's ability to raise equity capital or debt on favorable terms in the future is now impaired. Further, as the Securities Action and other related litigation continues to unfold, Berry will be continue to be damaged by the professional fees, costs and expenses incurred because of those matters, not to mention the decline in productivity associated with the distractions that come with exposure to litigation.

155.    The Individual Defendants have not fared nearly so badly, however. On the contrary, certain of the Individual Defendants have pocketed millions of dollars in compensation not justified by the Company's performance while under their stewardship. The Company has also incurred costs in connection with benefits paid to these Individual Defendants.

## VII.    DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

156.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties.

157.    Plaintiff is a current stockholder of the Company, has continuously held shares of the Company's stock since 2018, and was a stockholder of the Company at all times relevant to the Individual Defendants' wrongdoing alleged herein.

158.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

159.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously pursue this action.

160.    The Board currently consists of six (6) directors: defendants Smith, Baetz,

Mariucci, and Paul, and non-parties Rajath Shourie and Renee Hornbaker. A derivative plaintiff need only demonstrate reason to doubt that half of the directors are disinterested or objective in order to establish pre-suit demand excusal. Plaintiff has adequately alleged that there is reason to doubt that at least three (3) current directors of Berry are capable of disinterestedly and independently considering a demand to commence and vigorously prosecute this action, for the following reasons:

### A.    Defendant Smith Is Not Disinterested and Is Not Independent

161.    Defendant Smith is not a disinterested director because he faces a substantial likelihood of liability based on the related, sustained Securities Action. As alleged herein, defendant Smith is a named individual defendant to the Securities Action, and that action overcame the defendants' motion to dismiss and was sustained in its entirety, notwithstanding materially heightened PSLRA pleading standards. Thus, defendant Smith is exposed to potential individual financial liability, cannot be disinterested, and cannot exercise independent business judgment on the issue of whether Berry should prosecute this derivative action. Defendant Smith's liability is not speculative, and his substantial likelihood of personal liability is sufficient to excuse demand.

162.    Notwithstanding that he is an interested director, there is also reason to doubt that defendant Smith is capable of independently considering a demand to commence and vigorously prosecute this action, because defendant Smith's principal professional occupation is his employment as President and CEO of Berry. As President and CEO of the Company, defendant Smith has earned and stands to earn millions of dollars in annual salary, bonuses, and other compensation. For the years 2018, 2019, 2020, and 2021, defendant Smith received $1,372,525, $5,332,892, $9,591,787, and $4,994,569 in executive compensation, respectively, for a total of nearly $21.3 million.

163.    Accordingly, defendant Smith is incapable of independently considering a

demand to commence and vigorously prosecute this action against those defendants who control his annual compensation. The Company's Proxy Statements on Form DEF 14A also admit that defendant Smith is not an independent director.

### B.    Defendant Baetz Is Not Disinterested and Is Not Independent

164.    Defendant Baetz is not a disinterested director because he faces a substantial likelihood of liability based on the related, sustained Securities Action.  As alleged herein, defendant Baetz is a named individual defendant to the Securities Action, and that action overcame the defendants' motion to dismiss and was sustained in its entirety, notwithstanding materially heightened PSLRA pleading standards.  Thus, defendant Baetz is exposed to potential individual financial liability, cannot be disinterested, and cannot exercise independent business judgment on the issue of whether Berry should prosecute this derivative action.  Defendant Baetz's liability is not speculative, and his substantial likelihood of personal liability is sufficient to excuse demand.

165.    Notwithstanding that he is an interested director, there is also reason to doubt that defendant Baetz is capable of independently considering a demand to commence and vigorously prosecute this action, because defendant Baetz's principal professional occupation is his employment as EVP and CFO of Berry.  As EVP and CFO of the Company, defendant Baetz has earned and stands to earn millions of dollars in annual salary, bonuses, and other compensation. For the years 2018, 2019, 2020, and 2021, defendant Baetz received $1,044,045, $2,829,506, $4,987,082, and $2,772,536 in executive compensation, respectively, for a total of over $11.6 million.

166.    Accordingly, defendant Baetz is incapable of independently considering a demand to commence and vigorously prosecute this action against those defendants who control his annual compensation. The Company's Proxy Statements on Form DEF 14A also admit that defendant Baetz is not an independent director.

**C.    Defendants Mariucci and Paul Each Face a Substantial Likelihood of Liability**

167.    As alleged herein, well before the outbreak of the COVID-19 pandemic and months before the first stay-at-home order took effect in California on March 19, 2020, a "cost reduction plan" was initiated at Berry because the Company was not going to be able to meet its production targets due to the repeated failure to secure the necessary permits.  It is alleged in the Securities Action, which has survived the defendants' motion to dismiss and was sustained in its entirety notwithstanding materially heightened PSLRA pleading standards, that this "cost reduction plan" *was presented to the Board in the Spring of 2020, several months before the public announcement in April 2020 of the revised guidance and downward projection of production targets*.

168.    Defendants Mariucci and Paul have continuously served on the Board since September 2018 and February 2019, respectively.  Accordingly, the only reasonable inference is that defendants Mariucci and Paul received the presentation regarding the Company's "cost reduction plan" in early 2020 in their capacity as Board members, and failed to take action or otherwise stayed silent prior to the issuance of the Company's April 2020 disclosures, in violation of their fiduciary duties.

169.    In addition, defendants Mariucci and Paul each signed the Company's materially incomplete, misleading, and deceptive 2020 10-K, which as set forth above, among other things, attempted to exploit the COVID-19 pandemic as a reason for delay *even though Berry's so-called cost reduction measures that the 2020 10-K said impacted production were presented to the Board long before the first lockdown was instituted in California*.

170.    Thus, not only did defendants Mariucci and Paul turn a deliberate blind eye to materially false and misleading statements alleged herein that were made by certain other

Individual Defendants – in connection with the Company's 2020 10-K, *they participated in making false and misleading statements to stockholders themselves*.

171.     It is well-established that a substantial likelihood of liability exists where there is a conscious disregard of a duty to act.  Demand is regularly excused under Delaware law where, based on the facts alleged, it is reasonable to infer that directors consciously failed to take such action, in violation of their duties of loyalty and good faith.

172.     Under Delaware law, shareholders are entitled to honest communication from directors, given with complete candor and in good faith.  Communications that depart from this expectation, particularly where it can be shown that the directors involved issued their communication with knowledge that it was deceptive or incomplete, violate the fiduciary duties that protect shareholders.  Such violations are sufficient to subject directors to a derivative claim. Directors who issue false and misleading statements to shareholders are considered to be interested for purposes of pre-suit demand.

173.     Conscious disregard for the truth or falsity of statements issued on behalf of the corporation is a breach of the non-exculpable duties of loyalty and good faith.  When public representations are made to shareholders, directors are duty-bound to ensure that those statements are complete and truthful.  A fiduciary may be held liable for making a material misdisclosure, or if he or she authorizes without fault or knowledge a misleading disclosure, later comes into knowledge of the misleading nature of the previous communication, and knowingly and in bad faith -- in other words, dishonestly -- fails to correct the misleading impression created by the earlier communication.

174.     Based on the facts alleged herein, the only reasonable inference is that: (a) defendants Mariucci and Paul knew and approved of or consciously disregarded the issuance of

the series of false and misleading statements made during the "Class Period" between July 2018 and November 2020; and (b) in addition, defendants Mariucci and Paul joined in making materially incomplete, misleading, and deceptive post-Class Period statements to stockholders in the Company's 2020 10-K in February 2021.

175.    Accordingly, defendants Mariucci and Paul each face a substantial likelihood of liability, excusing demand.

## COUNT I

**For Contribution and Indemnification Under the Securities Exchange Act of 1934 Against Defendants Smith, Baetz, Grove, Buckley, Vazales, and Voiland**

176.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

177.    The Individual Defendants named in this Count – Smith, Baetz, Grove, Buckley, Vazales, and Voiland -- are named as individual defendants in the related, sustained Securities Action against Berry that is currently pending before this Court.  The conduct of these defendants has exposed the Company to significant liability under various federal securities laws by their disloyal acts.

178.    In the sustained Securities Action, the Company is alleged to be liable to private persons, entities, and/or classes by virtue of many of the same facts alleged herein. If Berry is found liable for violating the federal securities laws, the Company's liability will arise in whole or in part from the intentional, knowing, or reckless acts or omissions of all or some of the defendants as alleged herein, who have caused the Company to suffer substantial harm through their disloyal acts.

179.    The Company is entitled to contribution and indemnification from these defendants in connection with all claims that have been, are, or may be asserted against the

Company by virtue of their wrongdoing.

180.    As officers and directors of Berry, defendants Smith, Baetz, Grove, Buckley, Vazales, and Voiland had the power and ability to, and did, control or influence, either directly or indirectly, Berry's general affairs, including the content of its public statements, and had the power and ability to directly or indirectly control or influence the specific corporate statements and conduct that violated section 10(b) of the Exchange Act, SEC Rule 10b-5, and other securities laws.

181.    Defendants Smith, Baetz, Grove, Buckley, Vazales, and Voiland are liable under Section 21D of the Exchange Act, which governs the application of any private right of action for contribution asserted pursuant to the Securities Exchange Act of 1934.

182.    Defendants Smith, Baetz, Grove, Buckley, Vazales, and Voiland accordingly have damaged the Company and are liable to the Company for contribution and/or indemnification.

183.    No adequate remedy at law exists for Plaintiff by and on behalf of the Company.

**COUNT II**

**Breach of Fiduciary Duty Against the Individual Defendants**

184.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

185.    The Individual Defendants, as current or former Berry officers and/or directors, owe (or owed) the Company the fiduciary duties of due care, loyalty, good faith, candor, oversight, reasonable inquiry, and supervision.

186.    By virtue of their positions as Berry directors and/or officers, these Individual Defendants at all relevant times had the power to (and did) control, influence, and cause the Company to engage in the practices complained of herein, including the false and misleading

statements alleged herein.

187.    Each Individual Defendant was required to: (a) use his or her ability to control and manage Berry in a fair, just, and equitable manner; and (b) act in furtherance of the best interests of Berry rather than his or her own interests.

188.    By their acts alleged herein, including but not limited to causing Berry to issue false and misleading statements while concealing material adverse information and failing to ensure that the Company maintained adequate internal controls regarding financial disclosures, the Individual Defendants each breached their fiduciary duties.

189.    The Individual Defendants acted in bad faith, willfully, and/or recklessly in violating their fiduciary duties owed to the Company.

190.    Berry has been injured as a direct and proximate result of the Individual Defendants' wrongful conduct.

## COUNT III

### Against the Individual Defendants for Unjust Enrichment

191.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

192.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of Berry.

27.    Plaintiff, as a shareholder and representative of Berry, seeks restitution from the Individual Defendants, and each of them, and seeks an order of this Court disgorging all profits, salaries, benefits and other compensation obtained by these Individual Defendants, and each of them, from their wrongful conduct and fiduciary breaches.

### <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff demands judgment as follows:

A.      Against all the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

B.      Directing Berry to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its stockholders holders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before stockholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholder input into the policies and guidelines of the Board;

C.      Awarding to Berry restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

E.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


Date: October 20, 2022                                **FEDERMAN & SHERWOOD**

                                                        *s/William B. Federman*
                                                        William B. Federman (SBN 00794935)
                                                        212 W. Spring Valley Rd.

Richardson, TX 75081
(405) 235-1560
WBF@federmanlaw.com

**SHUMAN, GLENN & STECKER**
Kip B. Shuman
100 Pine Street, Suite 1250
San Francisco, CA 94111
(303) 861-3003
kip@shumanlawfirm.com

**SHUMAN, GLENN & STECKER**
Rusty E. Glenn
600 17th Street, Suite 2800 South
Denver, CO 80202
(303) 861-3003
rusty@shumanlawfirm.com

**SHUMAN, GLENN & STECKER**
Brett D. Stecker
326 W. Lancaster Avenue
Ardmore, PA 19003
(303) 861-3003
brett@shumanlawfirm.com

**RM LAW, P.C.**
Richard Maniskas
1055 Westlakes Drive, Suite 300
Berwyn, PA 19312
(484) 324-6800
rmaniskas@rmclasslaw.com

*Counsel for Plaintiff George Assad*